James BENJAMIN, Miguel Galindez, Bruce Hayes, Jose Saldana and Robert Eschert, detainees of the New York City House of Detention for Men, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Benjamin J. MALCOLM, Commissioner of Correction of the City of New York; Arthur Rubin, Warden, New York City House of Detention for Men; Gerard Brown, Deputy Warden, New York City House of Detention for Men; and Abraham D. Beame, Mayor of the City of New York, individually and in their official capacities, Defendants.

No. 75 Civ. 3073 (MEL).

United States District Court, S.D. New York.

May 19, 1983.

See also, D.C., 495 F.Supp. 1357.

The Legal Aid Society, Prisoners' Rights Project, New York City, for plaintiffs; William E. Hellerstein, Jonathan S. Chasan, Theodore H. Katz, Amy Rothstein, New York City, of counsel.

Frederick A.O. Schwarz, Jr., Corp. Counsel, New York City, for defendants; Leonard Koerner, Paul Rephen, Asst. Corp. Counsel, New York City, of counsel.

LASKER, District Judge.

CONTENTS

I.  BACKGROUND OF THE PENDING APPLICATION    670
II. FINDINGS OF FACT
     A.  CURRENT CONDITIONS — HDM    671
         1. Safety    672
         2. Activities and Recreation    672
         3. Sanitation    673
         4. Medical Care    674
         5. Fire Safety    675
         6. Visiting    675
         7. Compliance with Consent Decrees    676
            (a) Laundry Facilities    676
            (b) Personal Hygiene    676
         8. Breakfast Food    677
         9. Duration of Stay    677
     B.  CURRENT CONDITIONS — AMKC    677
         1. Safety    677
         2. Activities and Recreation    677
         3. Sanitation    678

CONTENTS—Continued

|  |  | 4. | Medical Care | 678 |
|  |  | 5. | Fire Safety | 678 |
|  |  | 6. | Visiting | 678 |
|  |  | 7. | Compliance with Consent Decrees | 678 |
|  |  | 8. | Breakfast Food | 678 |
|  |  | 9. | Duration of Stay | 678 |
|  | C. | EXPERT OPINIONS | | 679 |
|  | D. | CHANGES IN THE FACILITIES SINCE 1980 | | 683 |
|  | E. | DEFENDANTS' PLAN | | 683 |
|  | F. | CONCLUSIONS | | 685 |
| III. | CONCLUSIONS OF LAW | | | 685 |
| IV. | REMEDIES FOR OVERCROWDING | | | 688 |

Defendants move to modify two orders entered by this Court, the first of which, dated September 3, 1980, set a "cap" of 1200 inmates on the population of the House of Detention for Men ("HDM"), and the second of which, dated June 23, 1981, set a limit of 50 detainees per dormitory in the Anna M. Kross Correctional Facility ("AMKC").[1] Defendants assert that the conditions in the facilities and the applicable constitutional principles have been significantly altered since the entry of the orders, and that, accordingly, the enforcement of the orders is no longer justified in fact or in law. Plaintiffs, a class of inmates residing at the facilities, argue that neither the facts nor the law have changed to any significant degree.

A two-week hearing was held in March and April, 1983 to determine whether the conditions have changed sufficiently since the entry of the respective orders to justify modification under applicable law. Following a brief history of the action, our findings of fact and conclusions of law are set forth below.

## I.

## BACKGROUND OF THE PENDING APPLICATION

This action was filed in June, 1975, alleging that plaintiffs, inmates at the House of Detention for Men at Rikers Island, a New York City detention facility, were being subjected to conditions of confinement which violated their constitutional rights. The events preceding the establishment of the HDM population cap are set forth in detail in the decision of August 27, 1980, 495 F.Supp. 1356, familiarity with which is assumed.

In brief, after a lengthy trial held in 1976–77, the parties attempted to resolve their differences by negotiation, leading up to the entry of a "Stipulation for Entry of an Order," the pertinent provisions of which provide that:

"c. . . . [T]he parties agree:

(1) that the record in *Benjamin v. Malcolm* established plaintiffs' factual claim that, at the time of trial,[2]

f. The housing blocks at HDM and the institution at large were overpopulated; such overpopulation resulted in an atmosphere of tension and hostility, a strain on all of the institution's facilities, and interference with supervision, protection and provision of services to members of the plaintiff class.

(2) Plaintiffs are entitled, as a matter of law, to the entry of a judgment remedying the conditions described in paragraph (1) above;

(3) That plaintiffs reserve the right to litigate the issue of the appropriate remedy for the conditions described in para-

---

1. HDM and AMKC will be referred to by their initials or as "the facilities."

2. At the time of the trial, the population of HDM was about 1350; by the time of the 1980 decision, it had risen to approximately 1500.

graph (1), prior to the entry of judgment, and to contest, on appeal, the specific terms of any final remedy ordered by the Court."

On the basis of the Stipulation, the defendants' report of the 1975 riot at HDM, the record of the 1976–77 trial and the changes in conditions between the trial and the time of decision, we concluded that the conditions of confinement at HDM violated constitutional standards as those standards are articulated in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and that the appropriate relief was a population cap of 1200 inmates. That decision was not appealed.

Six months after the entry of the 1200 person population cap at HDM, plaintiffs moved for emergency relief from overcrowded conditions in all detainee dormitory housing, including the dormitories at AMKC, another pretrial detention facility located on Rikers Island. In response, defendants agreed to reduce the dormitory populations to 50 men per dorm. An order effecting the parties' consent to a 50 person per dorm limit was entered by the Court on June 23, 1981.

It is with respect to these two orders that defendants seek relief.

The case history subsequent to the entry of the orders is discussed below since it casts light on the pending application. In July, 1981, plaintiffs moved for an order holding defendants in contempt of consent decrees previously entered by the parties governing conditions in HDM and AMKC. Defendants cross-moved for relief from certain of the provisions of the consent decrees. On consent of both parties, the motions were adjourned *sine die,* subject to a referral to a neutral third party compliance consultant, to "advise and assist the defendants in achieving compliance with the Consent Judgments and to informally assist the parties in resolving disputes as to compliance with the Consent Judgments." (Order of June 18, 1982).

In addition to seeking relief from the obligations imposed by the consent decrees, defendants have also sought the assistance of the Court in complying with the population caps. In July, 1981, defendants moved for an order compelling the State Department of Correctional Services to remove "forthwith" from the City's detention facilities, as the State is required to do under New York Criminal Procedure Law § 430.-20, all inmates who had already been sentenced. The City's application was granted, and on August 20, 1981, the State was ordered to accept, within 48 hours of completion of transfer processing, persons housed at HDM who had been sentenced to terms of imprisonment in State facilities.

In November, 1982, during the course of a strike by attorneys employed by the Legal Aid Society, defendants sought relief from the population caps on the ground that the strike had caused a backup in the disposition of criminal cases by the New York courts and a consequent acute increase in population. Solely on the representations of the defendants, and over the objections of the plaintiffs, the Court granted defendants temporary relief from the population caps, to the extent of allowing them to house an additional 245 inmates in HDM and an additional 8 inmates per dormitory in AMKC until the strike concluded and its alleged effects had subsided.

Defendants now move to modify the orders which imposed population caps on HDM and AMKC. They seek to house 1872 inmates at HDM, an increase of 672 inmates over the population cap, and to make permanent the permission granted on a temporary basis during the Legal Aid strike to house 8 additional inmates in each of the 12 AMKC dormitories.

## II.

### FINDINGS OF FACT

#### A. CURRENT CONDITIONS—HDM

Having visited the facilities and heard the testimony of expert witnesses, Department administrators and inmates, we make the following findings of fact.

### 1. Safety

Central to the question of the constitutionality of institutional conditions is whether the inmates are safe in their persons.

Even to the untutored visitor, it is apparent that the structure of HDM frustrates the administration's attempt to provide inmates with security from one another. The length of the blocks and the three-tiered structure make it impossible for an officer to observe what is going on in parts of the block other than where the officer happens to be at the moment. An officer who is patrolling near the front of the block—as is more often the case—cannot adequately observe the back of the block—250 feet distant (Tr. 78), and an officer patrolling the flats cannot meaningfully observe what is going on on the second or third tiers. The inmate witnesses testified unanimously and credibly that officers rarely patrol the blocks because they are afraid; that during periods when the inmates are not in their cells, the officers read the newspapers or simply "hide" (Tr. 834); and that most fights are not observed, much less broken up by guards (Tr. 958, 1137–38). Inmates do not feel safe at HDM: the threat of robbery and assault is constant (Tr. 1138, 1162–63). This testimony was not contested either by cross-examination or by defendants' witnesses.

Defendants have informed the Court that if their application for relief from the population cap is granted, they will seek sufficient funds to add one additional officer to supervise each cellblock. At present, with a population of about 1400, there are three correction officers supervising cellblocks of approximately 180 inmates each. One officer is assigned to the "bridge," the area in the front of the blocks, and one officer to each side of the blocks. If the blocks were filled to capacity and one additional officer were added to each side, five officers would be supervising 240 inmates. Thus, under defendants' proposal, the current ratio of 60 inmates to each correction officer would be reduced to 48 inmates per officer, a definite improvement.

However, numbers do not tell the whole story. In the first place, we credit the testimony of plaintiffs' witnesses that the addition of only one officer per side would not go very far towards remedying the current, serious personal safety problems (Tr. 756, 1037–41). Moreover, the experts agreed that if the cellblocks were filled to capacity, incidents of tension and violence would be expected to increase more than in proportion to the increase in population (Tr. 378, 569, 732–34, 1033).

We conclude that the addition of one officer to each cellblock side would not adequately remedy the personal safety problems inherent in the architecture of the HDM cellblocks.

### 2. Activities and Recreation

The availability of programs is a component of the issue of personal safety: both defendants' and plaintiffs' witnesses testified to the fact that tensions caused by overcrowded living conditions are substantially affected by the extent to which activities outside the cellblocks are available.

Inmates are not required to remain in their cells throughout the day. For 14 hours per day, inmates may choose to be locked out of their cells, an arrangement markedly more flexible than in 1976, when this action was tried. During most of the time that inmates are not in their cells, they remain on the cellblocks or in the dayrooms adjoining the cells. Activities outside of the cellblocks include lunch and dinner, which are served in the mess hall, gym, law library, visits and classes. Each inmate is theoretically allowed one hour of gym a day, two hours a day at the law library, and three one hour visits per week. There are nine educational programs and each classroom accommodates 25 inmates (Tr. 62, 64).

In spite of the existence of this impressive array of activities, the fact is that inmates spend by far the bulk of their time on the cellblocks and the dayrooms with little or nothing to do. The dayrooms are theoretically equipped with "passive games" such as checkers and decks of cards;

however, according to the testimony of the inmate witnesses, the supply of these games is entirely inadequate, and inmates are not permitted to receive games as gifts from visitors. Even activities such as reading or writing letters are hampered by the noise, the inadequate lighting, and the press of other inmates.

With respect to activities off the cellblocks, inmates are technically free to spend four to five hours a day outside of the blocks. However, in reality, time off the blocks is considerably more limited. For example, with respect to recreation, on days in which the weather is deemed "inclement" (defined by Warden Bantum as temperatures of less than 32 degrees) four periods of indoor gym are available for 75 inmates per period (Tr. 118). On any day in which the temperature exceeds 32 degrees (regardless of rain or snow) (Tr. 111, 112) inmates may recreate only in the yard. Only one period of yard activity is called for the entire general population (Tr. 117). Many inmates are discouraged from participating in recreation because the gym and the yard are so crowded (Tr. 748). Inmates also testified that they refrain from participation in recreation because they perceive the crowded gym as dangerous. One inmate testified that after his first visit to the gym, at which he witnessed a near-riot, unseen by any guard, he decided that he was better off remaining on the cellblock during gym periods. Moreover, even for inmates that attend gym regularly, the one hour allotment includes the time involved in being escorted back and forth from the cellblocks to the gym. Having walked the length of the facility ourselves on a number of occasions, we found credible the inmates' testimony that, after accounting for escort time, actual recreation time in the gym may be reduced to as little as 15 minutes.

The other activities available to inmates—law library, classes and visits—are also overcrowded. Inmates testified that only 15 men from each cellblock may use the law library each night, so that if an inmate is not able to push his way to the front of the line when the law library activity is announced, he will be unable to attend that day. Moreover, even for those inmates who are able to attend, the facilities are overcrowded: there is a serious shortage of notary service and legal research assistance because many inmates request these services and limited staff is available to provide them. Moreover, the copying machine is frequently out of ink and paper. Inmate witnesses also testified that they have often signed up for other kinds of classes that have been offered, and then learned that the class was closed out (Tr. 852–53, 1094–95, 1154). As for visits, although inmates are allowed three hours of visiting per week, many inmates have no visitors. Less than ten percent of the detainee population usually have visitors on any given day during the week, while on weekends between 15 and 20 percent have visitors (Tr. 68) (Testimony of Warden Bantum).

In sum, time and activities off the cellblock are severely limited. The only time the inmates are certain of being off the blocks is at mealtime.[3]

3. Using the HDM Program Services Overview Report for November, 1982 through February, 1983, (Defs.' Ex. E) we calculate that the average inmate spends *less than one hour per day* off the cellblocks, excluding the time spent at meals. Our calculations are as follows:

| Activity | Average inmate hours per day | Source |
|---|---|---|
| Recreation | 246 | Ex. E ¶11(e) |
| Classes | 25 (760 hrs/mo/ ÷30) | Ex. E ¶3(k) |
| Law Library | 190 (95 inmates/day times 2 hours per inmate) | Ex. E ¶8(f), (g) |
| Visits | 161 | Ex. E ¶15(i) |
| Total | 622 inmate hours per day | |

At a total of 622 inmate hours per average day, each of the approximately 1400 inmates spends an average of .44 hours per day off the block

### 3. Sanitation

Plaintiffs' witness on sanitation, Samuel Hoover, testified at length concerning the facilities' sanitation problems. His testimony was largely unrebutted, and was entirely credible.

Hoover, a public health sanitarian with extensive experience in the field, particularly in the area of prisons,[4] (see Plaintiffs' Ex. 29), visited HDM in 1980 and again shortly before this hearing. He described the institution as seriously out of conformity with minimum public health standards in a number of ways.

For example, Hoover found that sanitary conditions in the kitchen facilities did not meet minimum public health standards (Tr. 618). The deep fat friers ranged from "very dirty to absolutely filthy;" foods such as flour were kept in containers without covers; block ice, used to cool beverages, was kept directly on "extremely dirty" floors in a freezer room; and cockroaches were found throughout the kitchen area. Dishes were washed at temperatures too low to sanitize them, while pots and pans were washed only with a hose: neither detergents nor chemical sanitizers were used.

He found similar sanitation problems on the cellblocks. The cell vents and exhaust vents were so dirty that they were clogged. Many of the cells, some of which were occupied as well as some unoccupied, contained inoperative toilets. Broken glass was found throughout cellblocks, and birds flew in through broken windows (Tr. 640). Exposed electric wiring was commonplace, as were broken light fixtures. The gross accumulations of garbage in the slop sink rooms and the litter on the catwalks and in the cells supported a high degree of vermin infestation (Tr. 659). In summary, Hoover concluded, and we credit his conclusion, that

"major efforts" would be necessary to bring the facility "up to minimal standards of cleanliness and maintenance." (Tr. 677). Moreover, he found no improvement of any significant degree since his visit in 1980.

Even defendants' witnesses concurred with Hoover's findings that substantial efforts were necessary in the area of sanitation. George Camp, one of defendants' experts on prison conditions, testified that he did not consider the sanitary conditions on the tiers to be satisfactory; he stated that "a systematic program of preventive maintenance and sanitary work" was necessary (Tr. 351). Similarly, Samuel Nelkin, the supervisor of the City's Public Health Sanitarium, testified that while he believed it was possible to clean HDM, "it would require a far more extensive effort than [he had] seen over the last three years" (Tr. 1335).

### 4. Medical Care

Dr. Robert Cohen, director of Rikers Island health services, testified that HDM and AMKC medical facilities are under strain at current population levels. Dr. Cohen testified that he believes it important to provide daily sick call for all inmates, but that the facility is currently unable to do so (Tr. 259). In addition, difficulty exists as to locating and escorting inmates for follow-up medical visits. This problem has been aggravated since the recent population increases. Furthermore, the rate of serious medical emergencies at HDM has also increased with the rise in population: 17 inmates were sent on emergency visits to Bellevue Hospital in January, 1983, and 19 were sent in February, compared with an average for the preceding six months of about nine or ten per month[5] (Tr. 253).

(excluding time spent at the mess hall for lunch and dinner).

**4.** Hoover received his Master Degree in Public Health from the University of California, Berkeley in 1961. Among his many positions, he has served as Chief Sanitarian for the Kansas State Board of Health and Director of Preventive Health Services for a five-state region on the United States Public Health Service. He

has inspected environmental health conditions at penal institutions at the request of, among others, the Department of Justice, the Federal Bureau of Prisons, the Kentucky Department of Justice, and the NAACP Legal Defense Fund, Inc.

**5.** In a memorandum to the Office of the Criminal Justice Coordinator dated November 26, 1982 concerning the effects of overcrowding,

Dr. Melvin Kaye, the director of mental health services for prison health, testified that there have also been shortages of mental health observation space from time to time (Tr. 312). Dr. Kaye observed that when such shortages occur, inmates with psychological problems have been housed "in areas other than those that are suitable," (*id.*) as, for example, being housed with general population inmates. Dr. Kaye stated that he has requested dormitory space for suicidal or depressed patients "on a virtually regular basis" but that his requests have not been met (Tr. 320).

The serious lack of adequate space for mental health care has been noted on other occasions. *See, e.g.,* the New York City Department of Health letter of January 4, 1983 to the Department of Correction, Health Services Management:

> "I do believe that DOC [the Department of Correction] has been remiss in one significant area. That is, the provision of more appropriate space for intensive levels of care ... [which] has been a pervasive problem for more than ten years. Simply stated, the DOC has never provided a physical environment that any professional auditing group would approve as an adequate setting in which to provide psychiatric care."

(Pls.' Ex. 16).

The actual impact of overcrowding on inmate mental health is difficult to measure, but we note that since the defendants were permitted to increase the population temporarily in November during the Legal Aid strike, there have been three reported suicide attempts at HDM. No suicide attempts had been reported during the five months preceding the increase (Tr. 84). Moreover, mental health referrals from HDM have increased about 50 percent in March over the average for previous months (Tr. 284).

With respect to dental care, no testimony was offered, but plaintiffs introduced the New York City Department of Health's

most recent report on health services at HDM, which states that "the staff indicated ... their strong feelings that the current level of dental coverage at HDM was insufficient." After deducting the hours of available dental care which are used to service the Rikers Island infirmary inmates, the staff calculates that the clinic is available only nine hours a week to provide dental care for a regular population of 1200, temporarily expanded to 1450 (Pls.' Ex. 38, at 16). In an intradepartmental memorandum dated February 3, 1983, HDM Captain Dixon stated that, based on his observations, "Many more hours of Dental Clinic operation is necessary if we are to adequately accommodate this institution's need" (Pls.' Ex. 4).

### 5. Fire Safety

Fire prevention capabilities are critical to an institution's ability to house a given number of inmates. HDM has no smoke alarms, no heat sensing devices, and no sprinkler system. Moreover, the undisputed testimony of Samuel Hoover, plaintiffs' sanitarian, established that the distances between the fire exits and the cells are beyond safe levels (Tr. 653). In addition, inmates who had been in custody at HDM for several months testified that only one fire drill had been held during the time of their detention, and that, during that drill, it took the guard "literally ten minutes" to open the fire exit (Tr. 931). Nor is the possibility of fire merely speculative: Warden Bantum testified that a fire is set, accidentally or otherwise, in approximately one cell each month (Tr. 1298).

### 6. Visiting

The overtaxed visiting facilities are also subject to serious shortcomings. Visitors to the facility testified that the visiting process is extremely wearing—consuming a large part of the day.

When visitors reach the Bridge Control Building on Rikers Island, they are given

---

Dr. Cohen stated that there have been instances of inmates "with serious medical conditions not receiving their proper treatment." Dr. Cohen described the current situation as creating a "potential for tragedy" (Pls. Ex. 14).

numbers. They then wait for a bus which takes them to the particular facility they are visiting. At the facility, they must wait for their numbers to be called, after which they are searched. After the search, they again wait to be registered, and after registration they wait again to be given a locker in which to keep personal possessions such as purses and coats which may not be brought into the visiting room. The visitors then wait still again to be searched, and then endure a final wait in the visitor waiting room.

Although the visitor waiting room and the visiting room itself are cheerful and in good condition, the other waiting facilities are crowded and dirty. Visitors testified to having had to wait outside in the rain and to there being an insufficient number of seats in the waiting areas. The entire process, from arrival at Rikers Island until the time of the visit, takes between two and a half hours on a good day to eight and a half hours on a particularly bad day. Total elapsed time of four hours on Rikers Island for a one hour visit appears to be average. We credit the testimony of visitor witnesses that the process is exhausting and degrading, and that a visit of one hour spent with an inmate may consume an entire day between the time the visitor leaves his or her home and returns. Visitors are discouraged from making visits—which are an important element in the lives of inmates—because of the arduous nature of the visiting process.

### 7. Compliance With Consent Decrees

On April 2, 1979, a partial final judgment by consent was entered, pursuant to which defendants agreed to institute a number of changes in programs and conditions. While the question of defendants' compliance with the consent decrees is not specifically at issue on this motion, it is pertinent to the question of defendants' ability to carry out the proposals for improvement which they have made in connection with the current application to permit an increase of population. If defendants have not been able to bring the facilities into compliance in four years, operating under constraints posed by a population ranging between 1200 and 1450, that fact sheds light on their ability to comply with those standards, as well as the additional requirements which it might become necessary to impose if the application to increase the population to 1872 were granted. Accordingly, we briefly review the state of compliance with the decree on points relevant to the present motion.

### (a) Laundry Facilities

Paragraph D(1) of the consent decree provides that the defendants are to furnish inmates with free laundry service "sufficient to provide all detainees with a neat, clean change of clothing and a clean towel at least twice a week." The unrebutted and unanimous testimony of the inmate witnesses was that laundry service is so poor that inmates prefer to do their own. They do so in buckets provided by the institution and in slop sinks, which Hoover, plaintiffs' expert sanitarian, described as so dirty that it was no longer possible to clean them (Tr. 627).[6] Many inmates fear that if they send their laundry to the institution's laundry facilities, it will not be returned to them (Tr. 639).

### (b) Personal Hygiene

Paragraph T of the consent decree provides that defendants are to furnish inmates, without charge, with certain personal hygiene items such as toilet paper, soap and toothpaste. Warden Bantum testified that personal hygiene items are not provided unless the inmate can demonstrate that he does not have funds to purchase them himself from the commissary (Tr. 1299). The inmates testified that there are shortages on the cellblock of these items, particularly of toilet paper.[7]

---

6. According to the inmates, laundry service is available only if the inmate can afford to pay a laundry worker.

7. It appears that defendants may be out of compliance with other provisions of the consent decrees with respect to conditions discussed above, e.g., sanitation (Consent Decree,

### 8. Breakfast Food

The unanimous testimony of the inmate witnesses, again unrebutted, was that there are shortages of breakfast food on a regular basis and that the problem has recently become worse. The shortages of breakfast food at HDM have led to "shoving, pushing and fighting because guys be trying to get into the day room to receive what little portions they may have coming to them because they run out of everything" (Tr. 837).

### 9. Duration of Stay

According to the March 29, 1983 records of the Department of Correction, the median inmate stay at HDM is 57 days, while the mean length of stay is 85.6 days. Of those who are not released within two weeks of arrival, over ten percent remain at HDM for longer than six months (Defs.' Ex. K, p. 2). Commissioner Ward testified that the average length of an inmate's stay in 1977 was 26 days (Tr. 415, 441), and that the addition of one day in the average length of inmate stay requires 177 extra beds at HDM.

### B. CURRENT CONDITIONS—AMKC

We discuss current conditions at AMKC more briefly because in many respects they are substantially similar to the conditions discussed above with respect to HDM.

### 1. Safety

As a rule, AMKC houses lower bail inmates than HDM (Tr. 192). However, AMKC is also a "reception" institution, which means that it houses, for periods up to a week, any new inmate that comes into the system before that inmate is classified and permanently assigned to a higher or lower bail institution (Tr. 193). Approximately 50 to 70 "reception" inmates enter AMKC each day, most of whom are housed

paragraph S) and law library conditions (Consent Decree, paragraph AA). However, because these matters are being reviewed by a neutral compliance consultant, and because we believe that the important work of the compliance consultant should not be affected by the

in the dormitories (Tr. 191). For the up to one week the inmate is in AMKC awaiting assignment, there is no internal classification system: inmates held on bail of more than $15,000 may be sleeping in dormitory beds next to inmates held on bail of less than $1,000 [8] (Tr. 192–93).

The dormitories are crowded: an inmate lying on his cot can touch the inmate on the next cot. Inmates have no privacy: there are no partitions between the beds, and the only other items of furniture, individual lockers, are not, at the present, provided with locking mechanisms, although the Warden testified that inmates who can afford to do so are permitted to buy locks (Tr. 196). Two correction officers are assigned to each dormitory of 50 to 58 inmates; one officer is stationed within the dormitory, and one remains behind the security gate (Tr. 200). However, we credit inmate testimony that the officer who is stationed inside the dormitory spends much of his time with the other officer behind the security gate (Tr. 1174, 1225).

Inmates described the atmosphere in the dormitories as "a constant air of steady tension," (Tr. 1174), explained by one inmate as a result of the fact that: "you have 58 people that by society's rules are undesirable, so when you put 58 undesirable people together in one room with nothing to do and nowhere to go, you got tension .... You got the strong as opposed to the weak. So there is tension all the time" (Tr. 1175). Fights occur frequently, some involving weapons, (Tr. 1176, 1250–5), as does robbery, including armed robbery between inmates (Tr. 1171). The inmates testified that robberies are generally not reported to the guards, (Tr. 1171), and that fights are reported "only if a person is severely cut" (Tr. 1253).

### 2. Activities and Recreation

According to both the inmates and Warden Bain of AMKC, most inmates spend the

deliberations in this proceeding, we refrain from consideration of those points.

8. The Warden testified that the facility is "in the pilot stages of a classification program" (Tr. 192).

majority of their time in the dormitories (Tr. 229). Six or seven dormitories are called to the indoor gym in each period. This means that more than 300 inmates are called to recreate in a gymnasium which, according to Warden Bain, can accommodate only 15 to 20 inmates, actively recreating, at one time (Tr. 208). The Warden agreed that "even with the dormitories limited to a population of 50, the AMKC gymnasium is inadequate to service the entire facility," (Tr. 207), and he indicated that he was aware that inmates refrained from going to the gym because it is too crowded (Tr. 209). Similarly, when recreation periods occur outdoors, only two periods are held to accommodate an institution of approximately 1800 inmates (Tr. 210).

### 3. *Sanitation*

Sanitation problems are not as serious at AMKC as at HDM. In fact, one inmate testified, "Since I have been there, basically, it has been a clean dorm," (Tr. 1263), although the recent increase in population has made sanitation more difficult to maintain. (*Id.*)

Because AMKC is a reception facility, however, certain sanitation needs are created which appear to be unmet. For example, inmates complain that reception inmates may be admitted with lice, and that no cleaning is done prior to assigning the infected inmate to a dormitory to be shared with 58 other inmates in very close quarters (Tr. 1248).

In addition, sanitation problems have been noted in the receiving rooms, in which inmates remain while waiting to be assigned to dormitories. The receiving room is often crowded: one inmate testified he was kept there with 50 to 60 inmates for two days (Tr. 1217). He stated that there was little room to sit down and that the inmates slept on the floor without blankets, sheets or mattresses (Tr. 1218). Hoover, plaintiffs' expert on sanitation, testified that the one toilet in the receiving room was flushing water and sewage onto the floor on the day he examined the room (Tr. 679).

### 4. *Medical Care*

Shortages of medical care at AMKC are similar to those discussed as to HDM. At present levels of population, daily sick call is not available to all inmates in spite of the fact that medical personnel deem such service important for an inmate population.

Inadequate mental health facilities appear to be a critical problem. All of the inmate witnesses testified to the presence of mentally disturbed inmates in general population dormitories (Tr. 1196–1200, 1241–43, 1261), a fact which creates problems not only for the disturbed inmates, who are often taken advantage of (Tr. 1243), but also for the healthy inmates, who find the presence of mentally unbalanced inmates unsettling (Tr. 226).

### 5. *Fire Safety*

As at HDM, there are no heat or smoke detection systems at AMKC, nor is there a sprinkler system.

### 6. *Visiting*

The lengthy waits that visitors must endure are similar at AMKC to those at HDM (Tr. 217). Moreover, the Warden testified that "the present visitor waiting room and actual visit room are inadequate for the population at AMKC," (Tr. 216), although he also stated that a new visiting area is being constructed (Tr. 219).

### 7. *Compliance With Consent Decrees*

The problems noted at HDM with respect to laundry and provision of personal hygiene items were also reported to exist at AMKC (Tr. 1189, 1247, 1259–69).

### 8. *Breakfast Food*

AMKC inmates, like HDM inmates, testified to shortages of food at breakfast, and to the fact that these shortages often lead to altercations between inmates (Tr. 1193–1195).

### 9. *Duration of Stay*

Warden Bain testified that many inmates are discharged from the dormitories within

four or five days, and that few stay for longer than two and a half weeks (Tr. 193, 195). Several inmates reported more lengthy stays (Tr. 1167–68, 1216).

Statistics requested by the Court and received after trial indicate approximately 44 percent of the AMKC residents remain in the dormitories for more than two weeks, and that over ten percent are in the dorms for more than two months. The median length of stay is reported as 12 days, and the mean is 24.6 days. (Attachment to May 17, 1983 Department of Correction letter to the Court, setting forth length of stay of inmates at AMKC dormitories on May 16, 1983).

## C. EXPERT OPINIONS

The parties each presented two expert witnesses. Those testifying for the plaintiffs were Mark D. Corrigan, the director of the National Institute for Sentencing Alternatives and the former First Deputy Commissioner of the New York City Department of Correction; and Gordon Kamka, former Secretary of the Maryland Department of Public Safety. Defendants' witnesses were George Camp, the president of the Criminal Justice Institute, a two-person research and consulting firm; and John R. Manson, the Commissioner of the Connecticut Department of Correction.

Each of the witnesses has substantial experience in the field of corrections.[9] However, Corrigan's recent and substantial experience with the particular facilities in question made his testimony more meaningful. As First Deputy Commissioner for the New York City Department of Correction between 1979 and 1981, Corrigan was the second ranking administrator for all departmental operations. He developed a thorough familiarity with the operations and staff at HDM through regular visits to the facility and meetings with the staff, and he was partially responsible for the establishment of the AMKC dormitories (Tr. 1017, 1046). He became well known to the Court during the course of his participation in earlier stages of the pending litigation.[10]

Corrigan visited HDM and AMKC shortly before the hearing. He testified about the problems at HDM during his tenure and the changes he noted during his pre-hearing visit. His conclusion captured the basic theme which ran throughout the record in this hearing:

"It is obvious to me that the general management of the facility has been markedly improved and that there is a very aggressive effort ongoing to maintain it and to keep it going. However, in my opinion, I think that that effort frequently is *working against the tide* . . . In no way do I mean to imply that as a failure of management but rather as an inability of management just to keep those blocks, because of their size and nature, clean and workable."

(Tr. 1036–37) (emphasis added).

In particular, Corrigan concluded that the risk of removing the present population cap

9. Prior to working as the First Deputy Commissioner for the City, Corrigan served as Executive Deputy Commissioner of the State Department of Correctional Services and as a Deputy City Administrator for the City of New York. Kamka served for six years as the Warden of the Baltimore City Jail. Camp was the Director for Correctional Services for the State of Missouri and an Assistant Commissioner for the New York City Department of Corrections for two years, from 1971–1973. Manson worked his way up through the Connecticut Department of Correction, starting as a probation officer in 1956.

10. Defendants attacked Corrigan's credibility by attempting to establish that he had left their employ on bad terms. Corrigan asserted that he left the Department on good terms and that his testimony was in no way motivated by personal animosity.

We found puzzling Corrigan's hesitancy in answering questions about events which occurred less than two years ago. However, in the course of Corrigan's many appearances before the Court, he impressed us as to his character and dependability, and we are satisfied that he testified in accordance with his sincerely held beliefs. Moreover, we find altogether unpersuasive defendants' argument that, in order to nurse an alleged grudge against the Department, Corrigan would, at his own expense (Tr. 1061) testify at this hearing and expose himself to the very criticism to which he is presently being subjected.

was "too great from the perspective of safety," (Tr. 1038), and that the addition of one guard to each side of each block, as proposed by defendants, would have little impact because the guards will tend to congregate in front of the blocks: "there is never really safety in numbers for correction officers in their relationship to offenders, [but] the idea is to be as close as possible to an associate" (Tr. 1041). Corrigan's testimony that the dangerous areas in the backs of the blocks and on the upper tiers will not be made less dangerous by the addition of one guard per side was persuasive.

In sum, we give substantial weight to Corrigan's opinion that "it is impossible to house 1800 people in that facility [HDM] and serve them suitably" (Tr. 1039).

Defendants' experts, Camp and Manson, disagreed with Corrigan: it was their opinion that it is possible safely to house the proposed additional inmates in HDM and AMKC. Although, as noted above, (see footnote 9), both witnesses have considerable experience in the field of corrections, the weight of their testimony was undermined by their unfamiliarity with the particular facilities at issue here.

It is true that both witnesses visited the facilities before testifying; however, Manson had never visited them previously and Camp had not done so since 1973. With respect to two of the most critical variables relating to the habitability of a detention facility, average length of stay and average amount of time spent on the cellblock during the day, neither had more than a general sense of the facts. The lack of knowledge as to the amount of time spent on the blocks particularly impairs the value of their opinions in view of the uniform testimony of all of the experts (as well as the inmates themselves) that idleness is strongly correlated with tensions and violence. Both witnesses based their assumptions about the time spent on the cellblocks on a listing of the available activities, without considering the fact that inmates are regularly unable to participate in recreation, education and law library because of overcrowding, and that only a minority of inmates receive visits. The simple tally of the activities available, upon which their opinions were founded, gives a greatly exaggerated sense of the actual amount of time spent off the cellblocks. To the extent that Camp and Manson based their conclusions on such an assumption, the conclusions must be discounted.

The defendants' witnesses' ignorance about the history of the institutions and of this litigation also reduced the value of their opinions. Camp was not familiar with the evidence of record as to conditions at HDM at the time of the trial in 1976–77, or the proceedings on the contempt motions filed in 1981. He had never seen or been informed about the consent judgments entered in this action. He had not seen the report on the 1975 riot at HDM, which caused millions of dollars in damages and endangered the lives of several correction officers, and in which the then-Commissioner of Correction stated that the major cause of the riot was overcrowding (Tr. 354, 363–64, 374).

Manson demonstrated a greater familiarity with the background of the present application, but he also had not seen the report on the riot, and, quite surprisingly, was under the impression that the population of HDM at the time of the riot was 4000 [11] (Tr. 590).

Of course, lack of familiarity with the history of the facilities does not disqualify a witness from having an opinion as to their capacity. However, an institution's capacity to cope with a given number of inmates is a function of many factors, most of which are difficult, if not impossible, to measure precisely. It is therefore relevant to the weight of a witness's testimony whether he is familiar with how the institution has

---

11. According to defendants' records, the actual population at the time of the riot was 1901, which amounts to slightly over one inmate per cell. A population of 4000 would have required housing more than two inmates per cell. We find it pertinent in evaluating Manson's testimony to consider that he believed that HDM could have held more than two men to a cell before it "boiled over."

functioned over time, under various managements, and with varying levels of population. Camp and Manson were basically ignorant of these factors; their knowledge of the institutions was acquired primarily from visits of a few hours duration. Despite their experience in the general field of corrections, the value of their opinions is reduced by their limited exposure to these institutions in particular and must be measured against the facts of record and our own experience with the facilities in question over a period of years.[12]

The conclusions of Camp and Manson that the facilities could accommodate the additional inmates requested are additionally questionable because they were based on the assumption that sufficient funds and staff would be available to maintain the current levels of programming and to increase sanitation and maintenance to a degree necessary to accommodate the increase in numbers. As we discuss below in Section II E, that assumption is subject to doubt.

In addition to having heard expert testimony, the views of State and City public and quasi-public bodies have been made part of the record in letter form.[13] These include the New York State Commission of Correction, the New York City Board of Correction and the Correctional Association of New York, each of which is vested by law with various duties concerning jail conditions.

The State Commission of Correction is the state agency responsible, *inter alia,* for "improving the administration of correctional facilities and the delivery of services therein," N.Y. Correction Law § 45(1). In its letter to the Court of April 6, 1983, the Commission states:

"[T]he numbers currently housed in the facilities are above what is considered secure and habitable levels by the Commission ... To ignore the circumstances

and grant the City's application will not only undermine the gains made since 1980, but will more importantly jeopardize the safety and well-being of employees and of prisoners in the subject facilities. The Commission opposes any temporary increase ..."

The New York City Board of Correction is charged by law to oversee and monitor conditions in New York City jails, as well as to establish standards for conditions in those facilities. Its representatives regularly and frequently visit the institutions for firsthand inspections. The City Board has also found that HDM is overcrowded; that New York City has, in effect, "run out of jail space." (Letter of March 11, 1983, Defs.' Ex. C, at 2). In particular, the Board found that since the population increased over the 1200-inmate cap during the recent temporary modification,

"inmates have begun to fight over the limited dayroom space, chairs, ... telephones and breakfast food ... In addition to the heightened tension and threat to safety resulting from competition over limited resources, noise has also risen above acceptable levels with the increase in population. This further contributes to inmate anxiety and officers' tension."

(*Id.* at 6). With respect to medical care and mental health, the Board states:

"[S]ince the census in ... HDM ... has increased, there has been a documented increase in mental health referrals and emergencies from HDM. * * * [Medical] Staff is insufficient ... to accommodate even the increase to 1400.... The dental clinic, too, cannot handle the present numbers."

(*Id.* at 6, 7).

Finally, with regard to service delivery and recreation, the Board finds:

"Over the last month and a half, as the facility consistently has operated with

---

**12.** The testimony of Camp and Manson is certainly not to be discounted in its entirety. To the contrary, we credit certain portions of their testimony, such as, for example, that the facilities appeared less tense than would be expected, which was the opinion of all of the experts,

and conformed to our own view upon inspection of the facilities.

**13.** The parties were served with copies of the letters, and commented on them during summation.

1300–1400 inmates, we have observed increasing service delivery breakdowns due to insufficient space, staff and other resources. * * * Indoor [recreational] space, staff and equipment are inadequate even at the 1200 level and inmates are denied meaningful recreation."

(*Id.* at 7).

With respect to AMKC, the Board states that "there are serious service problems which must be corrected," but advises that it believes the current level of population "would be acceptable on a temporary basis" (*id.* at 4) *if* defendants provided additional staff for health services and social services; additional mental observation space; additional officers and equipment for outdoor recreation; adequate indoor recreation space; adequate medical services and increased staff in the dormitories. The most pressing current needs pointed out by the Board are for additional health services staff, as to which the Board said that "[d]espite extreme increases in population . . . these staffs have not been supplemented" and for more dormitory staff, which the Board states "must be increased to provide adequate emergency response and security." (*Id.* at 5).

We are aware that, despite its factual findings, the Board has recommended that defendants' application to lift the cap be granted temporarily until the July, 1983 reopening of the Manhattan House of Detention for Men ("the Tombs"). However, we note that this recommendation is based on the assumption that the only alternative presented is "the indiscriminate release of inmates." (*Id.* at 2). We do not believe that this is an appropriate assumption: as we discuss below in Section IV, numerous alternatives to "indiscriminate release" are available.

The Correctional Association of New York also warns of the dangers of increasing the population at HDM. The Association, a private organization which has statutory authority to visit prisons and jails and report its findings to the legislature, has been involved in improving criminal justice operations in New York since 1844. Its expertise in the area of prison and jail conditions is recognized in the field.

The Association strenuously opposes the addition of greater numbers of inmates to HDM. It concludes:

"Such a step would strain to the breaking point basic institutional services such as visiting, meals, medical care, and recreation . . . [M]aintaining security would become even more problematic, and the level of violence . . . is likely to increase dramatically. A dangerous situation would become truly explosive."

(Letter to the Court, dated March 9, 1983).

Even defendants are on record as having seriously questioned the ability of HDM and AMKC to shoulder the heavy burdens which have been placed on them. For example, as recently as September 1, 1982, City Commissioner of Correction Ward, the highest New York City Correction official and under whose jurisdiction HDM and AMKC operate, testified before the City Planning Commission that HDM "is not suitable for housing detainees" and that "[t]he age and decrepit condition of HDM make it difficult for us to meet mandated standards for sanitation, noise levels and access to natural light and air." (Testimony of Benjamin Ward before the City Planning Commission, September 1, 1982, Pls.' Ex. 18 at 2, 3). At the hearing on this motion, Commissioner Ward asserted that he had changed his position, saying "I don't believe I would make that statement today" (Tr. 429). It is true that the Commissioner was under different constraints at the time he testified before the City Planning Commission than he was at the hearing; however, it would be irresponsible to disregard such positive statements made before the appropriate City Commission, and there is no evidence of record which would support a claim that what was "decrepit" in September is no longer so in April.

Moreover, as far back as their September, 1980 report to the Court on the Corrections Capital Development Program, defendants stated that HDM "has outlived its useful life and should be replaced" (Pls.' Ex. 1, at III–9). In particular, the report noted that

it would cost nearly $27,000 per cell to bring HDM "into compliance for use as detainee housing," and that even such expenditures "would have addressed only the most grievous of present conditions" (*Id.* at III–10). It is discouraging to note that the findings set forth in the September 1980 report as to the structural and systemic problems of HDM are confirmed by our findings above as to HDM's current problems (*Id.* at III–6, 7).

Similarly, with respect to AMKC, the 1980 report states that "dormitory housing is not advisable for male adult detainees" because "[t]he greatest number of suicides and suicide attempts are recorded for this group; high incident rates, escapes, and escape attempts also predominate." (*Id.* at IV–14).

### D.   CHANGES IN THE FACILITIES SINCE 1980

The Commissioner of Correction and the Wardens of HDM and AMKC testified at the hearing as to their efforts to improve conditions at HDM and AMKC. We were impressed by their concern for the welfare of the inmates and the efforts which they have undertaken to improve conditions. We concur with the finding of the Department of Justice National Institute of Corrections that: "The Department of Correction's administrators, although beset by serious operating problems, appear free of the cynical and defeatist attitudes so commonly encountered in staffs of crisis ridden, overcrowded institutions." (NIC Consultant's Report on jail crowding in New York City detention facilities, January 17, 1983, Pls.' Ex. 21 at 7).

There is no doubt that improvements have been made since the entry of the decree in 1980. Separate commands have been established for HDM and AMKC. Inmates eat lunch and supper off the cellblocks. The visiting area is pleasant and the law library has been expanded. Staff training has been increased. Procedures for producing inmates for court and for meetings with counsel have been ameliorated, although the testimony of the inmate witnesses established that particularly with regard to court appearances even the improved procedures leave much to be desired. Perimeter fencing has been installed, and we credit the testimony of Commissioner Ward that securing the facility from escape eliminates one source of tension between inmates and staff (Tr. 436). Of particular importance, the Department of Correction has received substantial increases in funding. Moreover, our general sense of the facilities, based, among other things, on our visits to them, leads to the conclusion that they are less noisy, less tense, and at least to some degree cleaner than they were in 1980. These improvements are clearly the result of the efforts and imagination of the Commissioner, the Wardens and their staffs.

However, even with the best intentions on the part of the administration and the staff, there is a limit to the number of persons which an institution can house. Defendants insist that the capacity of an institution is a function of the services which it provides, not the number of residents. However, capacity must be a function of both, and an institution's ability to deliver essential services is critical in determining whether the institution is or would be unconstitutionally overcrowded at a given level of population. In terms of maintenance, sanitation, medical care, and even such essentials as food and security from assault, HDM and AMKC, despite the vigorous efforts of their administrators, appear unable adequately to support even their current levels of population.

Nor does the fact that improvements have been made since 1980 demonstrate that the facilities are ready for a new influx of population. To the contrary, it is difficult to imagine that the facilities, overwhelmed as they presently are, could maintain even their current standard of service if any substantial increase in population was imposed upon them.

### E.   DEFENDANTS' PLAN

Defendants have proposed a plan to accommodate the additional population. The

major components are: adding one guard to each side of the cellblock; expanding outdoor recreation to two sessions per day and indoor recreation from the present four periods per day to six periods; expanding the medical clinic; setting up a mental health clinic within HDM and expanding the mental health clinic in AMKC; and employing a special maintenance task force to do repair and cleanup work.

With respect to the proposal to add one guard to each side of the cellblock, we have discussed above our reasons for believing the proposal inadequate. We credit the testimony of the inmate witnesses that the current ratio of staff to inmates is too low, given the length and the height of the cellblocks, to provide sufficient protection against incidents of violence. The addition of one guard to each cellblock would do little to improve the situation: each guard would be responsible for guarding 48 inmates, hampered by the architecture of the cellblocks, which makes it difficult for an officer in one part of the cellblock to observe activity at the other end or on the other tiers of the block. The problem is compounded by the fact that, as Mark Corrigan pointed out, there is an understandable tendency for correction officers to spend most of their time in the front of the cells with their colleagues, regardless of where they are theoretically stationed. Accordingly, we find that the addition of one officer would do little to remedy the dangerous conditions at the backs of the blocks and on the upper tiers.

The proposals for additional recreation also appear inadequate. At present, one session of outdoor recreation is called per day to accommodate 1400 inmates; the proposal calls for two sessions a day to accommodate 1872 inmates. It is true that the outdoor yard is 300 by 600 feet, the size of slightly under four football fields. Nevertheless, 900 men, the equivalent of the student body of a medium-sized high school, cannot meaningfully participate at one time in active recreation in a field even of that

size.[14] Similarly, defendants' indoor recreation plan is to add two sessions of gym for the additional 472 inmates. The current levels of indoor recreational availability are, as discussed above, insufficient. Even with a limit of 75 inmates per gym period, inmates described the gym as so crowded "there is usually not enough room to do jumping jacks" (Tr. 1151). We do not see how 472 inmates can be accommodated in two additional indoor gym periods, nor does it appear reasonable to expect that an entire facility of 1872 inmates will obtain adequate recreational opportunities with only two periods of outdoor recreation.

The proposals to increase medical and mental health facilities are unobjectionable: we credit the testimony of Drs. Cohen and Kaye that the proposed increases, if funded and staffed, would be adequate to serve the additional population.

Finally, in the light of past history of record, the value of the proposed special maintenance task force must be viewed with some degree of doubt. Plaintiffs' sanitation expert, Samuel Hoover, testified that he inspected HDM in 1980 and made substantially the same criticisms of sanitation and maintenance that he made at the present hearing. Defendants were advised of Hoover's criticisms in 1980; yet according to the testimony of Warden Bantum, the "special maintenance task force" was not set up until *a couple of days* before the instant hearing (Tr. 87). Moreover, the "special task force" is not made up of added staff; it is comprised either of staff who are being taken away from their duties in other parts of the institution or of staff "borrowed" from other facilities (Tr. 87). In any event, defendants certainly have not established that the special task force will be able to remedy the numerous sanitation and maintenance problems discussed above.

More to the point, the City has not yet appropriated any additional funds to support the increased correctional staff and medical facilities which defendants assert would be necessary to support the increased

14. The lack of space is made more vivid if one imagines 50 baseball games or 40 football games being played on the field at the same time.

population. The Office of Management and Budget has made no commitment to the Court; it has merely written to Commissioner Ward, stating that "the City will provide funding" for increased services. (Defs.' Ex. J, Letter of Paul Dickstein, Deputy Director, OMB, dated March 18, 1983 to Commissioner Ward). As the Commissioner himself testified, the deputy director's "approval" means "that we will give the Commissioner what he thinks we need after we sit down and go over that request with him" (Tr. 457).

Most important, in view of the history of this litigation, it would not be appropriate simply to assume that, if defendants' application were granted subject to court-ordered conditions, those conditions would be met, or continue to be met in the future. Defendants have been subject to court orders for many years, and all of the parties to this lawsuit know through frustrating experience that the entry of an order does not guarantee its timely observance. The Court has more than once been presented with motions to hold the defendants in contempt of existing court orders. No purpose would be served, and we believe the public would be greatly disserved, by the entry of an order subject to conditions that there is no assurance defendants will be able to meet. If the defendants, acting in good faith, as we assume they have been, have been unable to comply with judicial decrees when the population has been under 1200, we must seriously question their ability to comply with the additional conditions necessary to protect public health and safety within an institution of more than 1800, particularly in view of the architectural limitations involved.

## F. CONCLUSIONS

With respect to conditions currently prevailing at HDM, we find that inmates and guards are not safe from attack, sanitary conditions are substandard, and the institution is barely able to accommodate the current level of medical needs. Idleness is a chronic problem, as are lengthy waits for visitors in overcrowded and unsanitary waiting facilities. Laundry services are so deficient that inmates are washing their own clothing in buckets, which would clearly be unlikely to occur if acceptable laundry services were available. Food for the breakfast meal is in short supply. The average inmate is subject to these conditions for nearly three months.

With respect to AMKC, we conclude that it is substantially cleaner than HDM, and that the average length of stay is much shorter. However, problems with personal safety, and lack of adequate recreational facilities and medical care, particularly mental health care, are serious.

We credit Commissioner Ward and his staff with having made visible improvements since the entry of the population caps in 1980 and 1981. Nevertheless, the fact remains that even with a population reduced by the caps, the facilities are overwhelmed by the burden of housing the present numbers of inmates. Moreover, defendants' plan is inadequate to resolve the multiple problems discussed above, even were we to assume that it could and would become effective upon our so ordering it as a condition of lifting the cap. We cannot make such an assumption. This is *not* because we believe the Commissioner would choose not to comply with the orders of the Court; rather, it is based on our assessment of what is within the capabilities of the defendants to accomplish and, more important, on the built-in limitations of the facilities themselves.

In summary, we agree with every professional and public body which has studied these institutions since the commencement of this litigation that there is a limit to the number of inmates that these facilities can house in a constitutionally acceptable manner, and that that limit has already been reached.

## III.

## CONCLUSIONS OF LAW

Relying on *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), *LaReau v. Manson,* 651 F.2d 96 (2d Cir.

1981), and *New York Association for Retarded Children v. Carey (Willowbrook)*, 706 F.2d 956 (2d Cir.1983), defendants argue that the standards of law governing rights and remedies of detainees have changed since the entry of the orders at issue here. In reply, plaintiffs cite *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), and argue that a change in the law will not provide a basis for relief from a judicial decree in the absence of a showing that the dangers addressed by the decree "have become attenuated to a shadow." *Swift, supra,* at 119, 52 S.Ct. at 464.

The standard for evaluating a motion for relief from a decree entered in the context of "institutional reform litigation," which was unknown at the time of the *Swift* decision, has recently been elucidated by the Court of Appeals in *New York Association for Retarded Children, Inc. v. Carey (Willowbrook)*, 706 F.2d 956 (2d Cir.1983) (Friendly, J.):

"[I]n institutional reform litigation . . . judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, to improvement when a better understanding of the problem emerges, and to accommodation of a wider constellation of interests than is represented in the adversarial setting of the courtroom."

*Id.*, at 969. The opinion endorsed "modification with a rather free hand." *Id.* at 970.

■ The critical question on a motion to modify a decree is whether the proposed modification is "in derogation of the primary objective of the decree." *Id.* at 969. In *Willowbrook,* the proposed modification was intended to advance the decree's primary objective: to empty Willowbrook by a "reasonably early date." *Id.* The argument between the parties related only to the means for achieving that objective. By contrast, the proposed modification in the instant action is in derogation of the primary objective of the 1980 and 1981 decrees, which was to achieve a totality of conditions conforming with constitutional standards. The dispute between the plaintiffs and defendants at bar is not, as in

*Willowbrook,* over the preferable means for achieving the ends to which the decree was intended, but as to whether the proposed modification would or would not derogate the primary objective of the decree.

■ Plaintiffs' exclusive reliance on *Swift* (understandable in that *Willowbrook* was not yet decided at the time the instant motion was filed) must be considered in light of *Willowbrook*'s development of the law with regard to modification of decrees in institutional reform litigation. As *Willowbrook* recognizes, institutional reform litigation requires unusual judicial flexibility in response to changes in fact and law, because of the " 'widespread effect[s of the decrees] on persons not before the court,' " *id.* at 970, *citing* Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L. Rev. 1281, 1284 (1976), and the fact that institutional litigation continues under the court's guidance for substantial and perhaps indeterminate periods of time.

Nevertheless, defendants' reliance on *Willowbrook* is misplaced in the circumstances of this case: *Willowbrook* does not sanction the use of modification proceedings to abrogate "the primary objective of the decree," *id.* at 969, and, accordingly, while we view the changes of law and fact "with generosity," *id.* at 971, we are not free to reconsider the primary purpose of the decrees: to relieve unconstitutional strains on the facilities caused by overcrowding. The principle stated in *United States v. Swift & Co., supra,* 286 U.S. at 119, 52 S.Ct. at 464, that "[w]e are not at liberty to reverse under the guise of readjusting," has not been repealed by the *Willowbrook* decision.

Turning to the recent cases which defendants contend alter the constitutional standards for prison conditions cases, we do not understand *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), to have changed the law in any relevant aspect from what it was at the time the orders in question were entered.

■ In *Chapman,* the Supreme Court decided that the double-celling of prisoners in a facility which was otherwise "top-flight,

first-class," *id.* at 341, 101 S.Ct. at 2395, does not constitute cruel and unusual punishment. *Chapman* teaches that the constitutionality of prison conditions is not to be determined merely by looking at one factor—double celling—but by consideration of all of the factors that make up prison life, including adequacy of food, medical care and sanitation, *id.* at 348, 101 S.Ct. at 2399, levels of violence, *id.,* and the quality of maintenance of the physical plant. *Id.* at 341, 101 S.Ct. at 2396.

Our decisions in the instant case have never been based solely on any single factor, whether the level of population or otherwise. In sanctioning the decrees in question, and in evaluating the facts presented at the instant hearing, we have considered crowding as it affects all of the factors discussed by the Court in *Chapman.* On almost every factor which the Supreme Court deemed pertinent to the question of the constitutionality of prison conditions, the facility at issue in *Chapman,* as described in the majority opinion, is nearly 180 degrees different than the conditions found at HDM.[15]

Nor does *LaReau v. Manson,* the other case on which defendants rely, alter the standards from those on which we relied in imposing the 1980 population limits at issue. The *LaReau* Court utilized the standard set forth in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), as did we in our decision at 495 F.Supp. 1357, 1364–65. In fact, *LaReau* cited with apparent approval our decision in imposing the HDM cap: "[U]nder conditions worse than those at the MCC overcrowding could constitute punishment. *See, e.g., . . . Benjamin v. Malcolm,* 495 F.Supp. 1357 (S.D.N.Y.1980)." *LaReau, supra,* at 103.

We recognize that *LaReau* clarified the *Bell v. Wolfish* standard by outlining the relative importance of two variables: the duration of confinements and a realistic assessment of the alternatives to release.

*LaReau* emphasized the importance of the duration of confinement in determining whether conditions of confinement meet constitutional requirements. Certain conditions which were deemed unconstitutional "when a detainee is subjected [to them] for a substantial length of time," were held "constitutionally permissible for presumptively innocent detainees for a maximum of 15 days." *LaReau, supra,* at 105.

With respect to duration of confinement at the facilities at issue here, the mean length of stay at HDM is 85.6 days, although approximately 18 percent are released within fifteen days (Defs.' Ex. K). At AMKC, the mean length of stay is 24.6 days. Approximately 56 percent of the inmates in AMKC dormitories are released within two weeks, although over ten percent remain for more than two months. (Attachment to May 17, 1983 Department of Correction letter to the Court).

In *LaReau,* the Court of Appeals held that the district court had accorded insufficient weight to the factor of duration of confinement. Accordingly, the court reversed the district court's imposition of a population cap and modified the decree to allow inmates to be double-celled for a period of up to fifteen days.

No evidence has been presented as to whether such an alternative is practicable at either of the facilities in question here. Based on all of our experience with HDM, we do not believe it would be feasible to segregate the short-term from the long-

---

15. For example, the district court in *Chapman* described the facility at issue there, the Southern Ohio Correctional Facility (SOCF), as "unquestionably a top-flight, first-class facility." 452 U.S. at 341, 101 S.Ct. at 2395. No one who has visited HDM or AMKC could describe either in such terms. Similarly, the *Chapman* district court found no evidence that food facilities had been overtaxed by the alleged population. The district court further found that double celling had not reduced significantly the availability of space in visitation facilities; *id.* at 342, 101 S.Ct. at 2396, and that medical care and sanitation were adequate. *Id.* at 348, 101 S.Ct. at 2399. The cells in SOCF were described as "exceptionally modern and functional." *Id.* at 349 n. 13, 101 S.Ct. at 2400 n. 13. With respect to all of these factors, our findings above, see Section II, indicate that the overcrowding at HDM and AMKC has created severe strains.

term inmates in order to house the long-term inmates in less crowded facilities. With respect to AMKC, we cannot determine on the present record whether such a system would be feasible. In any event, defendants are not presently seeking leave to implement a *LaReau*-type alternative.[16]

The second issue underlined by *LaReau* was whether the district court had based its order on "an unrealistic assessment of the state's ability to comply fully [with the court's order] without releasing inmates into the community." *Id.* at 110. The Court found that the district court had based its order on such an unrealistic assessment and, for that reason as well, reversed the district court's imposition of a population cap.

We have devoted considerable study to the many alternatives to release suggested by various expert agencies, as outlined below in Section IV, and we conclude that the defendants can comply with the population caps without the necessity of releasing inmates into the community.[17]

█ In summary, we conclude that the general legal standards for evaluating conditions of pretrial detention have not changed since the time that the population caps were decreed. The two factors which have received increased attention since that time, duration of stay and the ability of the state to comply without releasing inmates into the community, see *LaReau v. Manson, supra,* have both been considered on this application. Accordingly, the population

16. In this regard, it is worth noting that *La-Reau* was decided three weeks *before* defendants consented to the 50 person per dorm cap at AMKC. At no time since the *LaReau* decision was rendered, including the discussions immediately prior to the institution of the cap, have defendants indicated a belief that a *LaReau*-type modification might be applicable to AMKC.

17. However, while *LaReau* teaches that the trial court should consider whether realistic alternatives to release are available, we do not understand it to have overruled cases in this Circuit which provide that, under appropriate circumstances, release may be ordered. *See Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 399 (2d Cir. 1975) ("this Court is hardly in the position to

caps established in 1980 and 1981 are still proper and necessary to afford inmates in HDM and AMKC constitutionally adequate conditions of confinement.

## IV.

### REMEDIES FOR OVERCROWDING

█ Our conclusion that to allow the populations of HDM and AMKC to be increased would result in the institutions being unconstitutionally overcrowded is, as it is required to be, an objective finding based on the facts relating to the facilities themselves. It does not depend on a determination that alternatives exist either to the proposed population increases or to releasing inmates, and the law does not require such a determination. However, *LaReau* suggests canvassing the alternatives, and whether the law requires it or not, it is surely appropriate for a court fashioning a decree in an institutional reform case to make such a determination.

█ That task has been facilitated by the existence of a wealth of material proposing alternatives to the increases of population requested by the defendants. We have analyzed this material with care and conclude that a variety of methods exist to deal with increased numbers of criminal defendants without jeopardizing public safety even if the population caps at HDM and AMKC are maintained.

order the City to raise the necessary funds to build additional facilities. We can, however, order the release of persons held under conditions which deprive them of rights guaranteed by the Constitution unless the conditions are corrected within a reasonable time."); *Rhem v. Malcolm,* 507 F.2d 333, 341 n. 20 (2d Cir.1974) ("This Court ... cannot require the voters to make available the resources needed by public officials to meet constitutional standards, but it can *and must* require the release of persons held under conditions which violate their constitutional rights, at least where the correction *of such conditions is not brought about within a reasonable time*") (emphasis added) (quoting *Hamilton v. Love,* 328 F.Supp. 1182, 1194 (E.D. Ark.1971).

At the request of Commissioner Ward, two recent studies have been conducted on alternative means for dealing with overcrowding in the city jails, one by the United States Department of Justice's National Institute of Corrections ("NIC") (Pls.' Ex. 21); the second by a newly-created Committee on Jail Overcrowding under the direction of Dr. Gerald W. Lynch, President of the John Jay College of Criminal Justice ("the Lynch Committee") (Pls.' Ex. 22). Both reports conclude that a number of cures for overcrowding exist, and that implementation of such alternatives would in fact result in cost savings to the city.

The Lynch Committee found that "there is a significant number of prisoners who could be released on bail, and others who could be appropriately punished or supervised without recourse to maximum security confinement, thus freeing valuable resources in terms of space, personnel, etc." (Lynch Committee Report, Pls.' Ex. 22 at 2). The Committee listed eight proposed alternatives to incarceration, two of which the Committee believed could be implemented immediately: allowing the usage of ten percent cash as security for bails of $2500 or less; and acceptance of personal checks or credit cards for posting of bail. Utilization of these alternatives, the Committee states, could free up over 1,000 beds a day in Department of Correction facilities at minimal cost.[18] Other suggestions by the Lynch Committee include: expanding the use of intensive probation, community service and victim restitution as alternatives to incarceration for selected defendants; expanding pretrial services in order to hasten the bail process for detainees who are in any event going to be released within a short period; and expediting case processing so as to decrease pretrial detainees' lengths of stay. According to the Committee, the significance of the last possibility

"cannot be understated.... If length of stay in 1983 was back to 26 days [the average length of stay in 1977], 2456 daily beds would be freed up [throughout the city jail system]." *Id.* at 24.

It is worth noting that, in the opinion of the Committee, the proposed alternatives would reduce public expenditure; for example, the Committee estimates that if pretrial services were expanded by 15 employees at a cost to the city of $300,000, approximately 300 beds, costing $3 million, would be saved each year. *Id.* at 22.

Nor is there reason to believe that the public safety would be adversely affected by the implementation of the Committee proposals. The rationale is as follows: Bail is set for many defendants at a low enough amount that the defendant is expected to post bail and remain at liberty pending trial. With respect to those defendants, the public safety is no more endangered if they are released in six days, after protracted bail processing, than if they are released in half a day, after expediting bail processing.[19] This explanation was clarified by the following interchange at the hearing:

"THE COURT: I take it what you are saying is if they could be allowed out in eight days, they can't be very great threats and therefore they should be allowed out in two days?

THE WITNESS: [Mark Corrigan] That's right, and if the judge is setting that low bail level, the assumption is they will be back out on the street. But the fact is they are out in five days and tie up the system. Invariably the judge will say 'I didn't realize they stayed in that long. I thought they were going to be out that afternoon.'"

(Tr. 1060).

The conclusions of the NIC study parallel those of the Lynch Committee. The NIC's

---

**18.** The Committee concluded that no additional costs would be associated with the first alternative, and that the only cost of the second would be the charge incurred to hire a service similar to those used by merchants to verify checks.

**19.** We discuss this matter in terms of protecting the public because that is the issue as it has been framed in various public discussions of the question. However, as a matter of law, the purpose of bail under the New York statute appears to be restricted to assuring the defendant's appearance at trial. N.Y.Crim.Proc. Law § 510.30(2)(a) (McKinney 1971 & Supp.1982).

consultant team "felt unanimously that the jail population could be significantly reduced without jeopardizing the safety of New Yorkers, in ways that could save money for all New York taxpayers." (Cover letter to NIC Consultants' Report, Pls.' Ex. 21, dated January 17, 1983). Many of the proposals of the Lynch Committee were also suggested by the NIC.[20] In addition, the NIC recommended relieving pressure on the system by authorizing the Commissioner to reduce by five days per month the terms of sentenced prisoners. This suggestion follows similar actions taken in other jurisdictions.

Statutes authorizing early release of sentenced prisoners when prison populations rise above specified levels now exist in Michigan, Ohio, Connecticut and Georgia, among others. Moreover, both the Committee on Corrections of the Association of the Bar of the City of New York and the Criminal Justice Section of the New York State Bar Association have separately and recently memorialized the New York Legislature, because of concern that overcrowding poses a grave risk of violence and breakdown, to establish "Emergency Standby Release Power by which the Governor would be authorized to accelerate scheduled prisoner release dates by up to 90 days, whenever the New York State Correctional System is over 105% of capacity for a period of 90 days, until aggregate prisoner population is reduced to 97% of prison capacity."

Of the approximately 10,000 prisoners held on Rikers Island, some 2700 are misdemeanants serving sentences for less serious offenses of one year or less. If the Mayor were authorized, whenever the city system exceeded 105% of capacity, as it probably does now, to accelerate the release of those who had served six to nine months or more by one or two months, several hundred beds—perhaps more than the number at issue in this case—would be made available to the City without cost.

The New York City Board of Correction has endorsed the conclusions of the Lynch Committee, and, in addition, made specific recommendations which, it asserts, "should be implemented immediately," including: expedited sentencing of the 500 or so inmates who are awaiting sentence; immediate emergency expansion of the work release program; and meaningful implementation of bail reviews. (Letter to the Court, dated March 11, 1983, Defs.' Ex. C at 8, 9).[21]

Some of the proposals discussed above will of course take time to implement; others can be put into effect with minimal delay.[22] It is worth noting that many of the proposals and the data on which they are based have been available for a long time. For example, in October, 1980, the Correctional Association of New York, after an extensive study of New York City's pretrial detention system, submitted a thorough report which included many of the same kinds of information and proposals made by the Lynch Committee and the NIC. (Report of the Visiting Committee of the Correctional Association of New York, dated October 1980 Pls.' Ex. 23). Of particular interest, the 1980 report states:

> In this connection, we further note that the Department of Correction expects to reopen the Manhattan House of Detention for Men ("the Tombs") in July of this year (Tr. 508–09).

**20.** The NIC also suggested the possible availability of financial support to the city for the purpose of establishing a city-wide coordinating group to develop a formal plan for management of the city's jail population. *Id.* at 25, 21.

**21.** Another possibility which exists for the city would be to build further temporary facilities, as it has already done since 1980. However, while such a solution, if it became necessary, would solve some of the problems at HDM and AMKC noted above, the creation of such new facilities would tax central services of the existing institutions to the same extent as if the use of added cells at HDM or larger dormitory populations at AMKC were authorized.

**22.** A few of the proposals appear to be capable of fairly rapid implementation. For example, Commissioner Ward testified that he has already begun implementation of the Lynch Committee proposal of accepting checks and money orders for bail (Tr. 424). In addition, the Commissioner has caused letters to be sent to all state court judges reminding them of the availability of partially secured bail (Tr. 425).

"Over 80 percent of detainees who post bail do so within seven days of their initial confinement. The key is to develop procedures to identify such persons and locate potential sureties earlier in the process to facilitate the posting of bail *prior to* transportation to jail."

(*Id.* at iv). The report goes on to list many possible methods for facilitating speedy posting of bail (*Id.* at 8–9). The report also recommends expanding pretrial services, a suggestion of the Lynch Committee, and increasing the use of Desk Appearance Tickets, a suggestion of the NIC.

Many of the proposed alternatives cannot be implemented by the Department of Correction without the full cooperation of the other actors within the criminal justice system. We fully credit the finding of the NIC that:

"The component of New York City's criminal justice system most under fire because the City's jails are crowded— namely, the Department of Corrections— is the component least able to impact the crowding problem. * * * The DOC is essentially the housekeeper for a problem of others' making. There is virtually no chance that the City's overcrowding problem can be brought under any significant degree of control unless and until officials of [the other] components of criminal justice . . . accept some share of responsibility for the problem's existence and for its resolution."

(NIC Consultants' Report, Pls.' Ex. 21 at 7, 11–12).

It follows that if the Department cannot do the job without the assistance of officials of the other components of the criminal justice system, it is entitled to that assistance.[23]

The standard which guides us all is the Constitution—from which flows the right to non-punitive conditions of custody for non-convicted prisoners. In this connection the words of the United States Supreme Court in *Kolender v. Lawson,* —— U.S. ——, ——, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903 (1983) decided only weeks ago, are illuminating:

"Appellants stress the need for strengthened law enforcement tools to combat the epidemic of crime that plagues our Nation. The concern of our citizens with curbing criminal activity is certainly a matter requiring the attention of all branches of government. As weighty as this concern is, however, it cannot justify [action] that would otherwise fail to meet constitutional standards . . ."

\* \* \* \* \* \*

For the reasons stated above, defendants' motion is denied.

It is so ordered.

---

**23.** In discussing various alternatives at the hearing, Commissioner Ward stated to the Court: "if you release him [a pretrial detainee], someone will hold you responsible for releasing him; if I release him someone will hold me responsible. You have lifetime tenure and I don't." (Tr. 506). However refreshing Commissioner Ward's candor, lifetime appointments do not authorize federal judges to issue orders in excess of their jurisdiction, and elected and appointed officials are not barred from pursuing creative recommendations made by responsible public bodies.