James BENJAMIN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et al., Defendants.

75 Civ. 3073 (MEL).

United States District Court,
S. D. New York.

Dec. 22, 1981.

The Legal Aid Society, New York City, for plaintiffs; Theodore Katz and Jonathan Chasan, New York City, of counsel.

Allen G. Schwartz, Corp. Counsel of City of New York, New York City, for city defendants; Leonard Koerner, Paul Rephen, Commissioner Benjamin Ward, Deputy Commissioner Ellen Schall, New York City, of counsel.

Robert Abrams, Atty. Gen., New York City, for state defendants; Eleanor Janosek Doyle, Deputy Asst. Atty. Gen., Commissioner Thomas F. Coughlin, III, New York City, of counsel.

LASKER, District Judge.

This suit was commenced against New York City officials in 1975 by persons housed while awaiting trial at the House of Detention for Men on Rikers Island (HDM). They complained that the conditions under which they were held were constitutionally impermissible, and in particular that the institution was unconstitutionally overcrowded. In August of 1980, after five years of litigation which included a lengthy trial and substantial post-trial negotiations between the plaintiffs and the City defendants, this court ruled that, in order to meet constitutional standards, the population of HDM be reduced to 1200.[1] *Benjamin v. Malcolm*, 495 F.Supp. 1357 (S.D.N.Y.1980).

In August, 1980, the City defendants moved to join the Governor of New York and the Commissioner of the Department of Correctional Services of New York State (the State) as defendants. The City argued that the State was obligated under § 430.20 of the New York Criminal Procedure Law to remove "forthwith" from City facilities persons sentenced to imprisonment in State institutions; that the State was failing to meet this obligation and that its failure prevented the City from meeting its obligations under this court's order to limit the population of HDM. That application was denied solely because of the assurances given by the State Commissioner that the State would voluntarily meet its obligations under Criminal Procedure Law § 430.20. *Benjamin v. Malcolm*, 88 F.R.D. 333 (S.D.N. Y.1980).

Although the problem was thus temporarily solved by voluntary action, the growth of the State prison population in the period between the summer of 1980 and the summer of 1981 resulted in a renewed failure of the State to remove State prisoners from City facilities on a timely basis, so that in July 1981 the City again moved for a judicial order requiring the State to do so. That application was granted and on August 20, 1981 an order was entered requiring the State to accept, within forty-eight hours of the completion of transfer processing, each person housed at HDM who is sentenced to a term of imprisonment in a State correctional facility.

The State inmate population has continued to grow since that date and now, less than four months after the entry of the order, the State moves under Rule 60(b)(6) of the Federal Rules of Civil Procedure to modify the August 1981 judgment so as to permit the State to accept only those State-ready inmates which it has spaces for within the State correctional system. The State emphasizes that its request for modification is temporary only because it is in the process of constructing additional capacity which, it alleges, will by March 1, 1982 make available 1,317 new beds. It estimates that the maximum "backup" population of State-ready inmates which it would fail to remove from HDM in the intervening period would be 303, and the minimum 20. (Affidavit of Thomas E. Coughlin, III, Commissioner of the Department of Correctional Services of the State of New York in Support of the motion.)

I.

The State argues that the relief it seeks is justified because it has "taken every possible initiative to create cell space in existing facilities", has utilized recreation areas,

---

[1.] The decision also required that population of the cell blocks be reduced so that each cell block be limited to its proportionate share of 1,200 persons.

basements and substandard galleries, and rejected the Department's long standing policy of refusing to "double-encumber" all space—that is, has even utilized cells of inmates who are in the hospital or out to court. The State claims that as a result of the present overcrowding in its prisons it has discontinued rehabilitation and program efforts, and that the present population of 25,490 prisoners amounts to 112.1% of its system's capacity. It contends that further population growth will cause "unacceptable risks to the safety and security of the employees, the inmates and the institution", including the housing of inmates in the cell-block corridors of maximum security prisons and the use of current program space for inmate housing in such institutions.

The City vigorously opposes the State's request for relief. Its arguments are set forth in the affidavit of Benjamin Ward, Commissioner of the New York City Department of Correction who, immediately before coming to his present position in August 1979 was, for over three years, the Commissioner of the Department of Correctional Services of the State of New York and who, accordingly, has intimate knowledge of the operations of both systems. According to the City, the State is not entitled to relief because it has failed to provide a solution for the problem it faces today although the problem was entirely forseeable. For example, the City points out that in 1978, Ward, then State Commissioner, drew up a construction plan which would have resulted in the provision of 3,000 beds, but that the State failed to implement it; and that the present State correctional administration, in its 1980 Master Plan, called for consideration of expanded use of "good time", increased use of alternatives to imprisonment and earlier parole, to reduce prison population, but that none of these proposals has been acted on.[2]

The City points out that it has reduced its own overcrowding not only by adding 900 beds to its capacity in the last year, but also by conducting monthly bail reviews, funding additional community services programs as alternatives to incarceration and decreasing inmates' lengths of stay by expediting the preparation of probation reports. It suggests that similarly creative approaches should be used by the State and that their absence renders it against the interests of justice to grant the State's application. It concludes that "Surely overcrowding City jails with convicted felons is the least desirable of the solutions to the State defendants' problem."

Moreover, the City claims that since the State releases approximately 173 inmates per week from its prisons and takes only an average of 160 from the City it is attempting, by this motion, merely to accommodate the other counties in the State from which it draws the remainder of its population.

The City points out that litigation is pending in the Supreme Court of the State of New York, Albany County, in which a class of New York State inmates contends that under § 70.30, subd. 3(a) of the New York Penal Law there are approximately 2,000 inmates who have not received credit for their jail time before sentencing; that these inmates will be released earlier if their claims are correct; that all of these inmates come from outside of the City of New York, and that the State should be required to recalculate their jail time credit before the court acts upon the present motion.

The City casts doubts upon the State's assertion that its present population amounts to 112.1% of the capacity of its system. It stresses that the State has not indicated the square footage per inmate upon which that figure has been calculated, or whether capacity has been adjusted to account for the current use of general confinement beds vacated by inmates in special housing, for example.

---

2. It should be noted that only some of these methods of population reduction are within the control of the Department of Correctional Services. For example, alternatives to incarceration depend largely on the action of the courts, and earlier parole on the policies of the Parole Board. However decisions as to "good time" and as to work-release programs are made by the Correction Department.

The plaintiffs take no position as to the relative responsibilities of the City and State for State-ready inmates but express their concern that compliance with the Court's orders eliminating overcrowding in the City's jails be assured. In this connection the plaintiffs argue that the State has not established any facts which would justify a modification of the order of August 20, 1981. The plaintiffs criticize the State for considering the only solution to the problem to be the creation of further cell space without making any efforts to manage prison population by other means.[3]

## II.

Rule 60(b)(6) reads:

"On motion and upon such terms as are just, the court may relieve a party or his legal representatives from a final judgment, order or proceeding for (6) any ... reasons justifying relief from the operation of the judgment."

The rule implies, by stating that relief shall be granted "upon such terms as are just" that a significant change of circumstance shall have occurred since the date of the final judgment to warrant its modification, and the courts have acted accordingly. The pattern for the disposition of a motion for such relief was drawn in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). In *Swift*, Mr. Justice Cardozo, speaking for the court, stated:

"There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned."

*United States v. Swift, supra*, 286 U.S. at 119, 52 S.Ct. at 464.

Although *Swift* antedates the enactment of the Federal Rules of Civil Procedure, its pronouncement has been regularly followed

---

**3.** Peter Tufo, Chairman of the Board of Correction of the City of New York, which is legally charged with setting minimum standards for the City jails and overseeing their population, has also written to the court in opposition to the motion. His letter follows:

"December 15, 1981

BY HAND
Hon. Morris E. Lasker
United States District Judge for the Southern District of New York
United States Courthouse
Foley Square
New York, NY 10007
  Re: *Benjamin v. Malcolm*
  75 Civ. 3073 (MEL)
Your Honor:

I would like to state my opposition to the State defendants' motion, returnable on December 16, 1981, to modify the Court's Order of August 20th.

The State has put forward no facts which justify a modification of the Court's order. The factors which your Honor considered at the time of the initial decision still compel the State to fulfill its legal obligation. The City system remains seriously overcrowded, and a modification of the Court's order certainly would add to the City's space burden.

As I testified before the Court on July 28, 1981, it is the State which properly should make room for its inmates, and by managing its population this can be done without creating unconstitutional conditions in its prisons.

Respectfully yours,
/s/ Peter Tufo
Peter Tufo
Chairman

PT:er
cc: Leonard Koerner, Esq.
  Ellen Schall, Esq.
  Alan Adolph, Esq.
  Theodore Katz, Esq."

in decisions relating to Rule 60(b)(6) and has become part of the canon of the Rule.

We agree with the City and the plaintiffs that the State has failed to make a showing that circumstances have so changed in four months as to warrant a modification of the judgment of August 20, 1981. Moreover, the only circumstance which has changed—an increase in the population of the State's prison population—was entirely foreseeable in August, 1981, and had been for a long period before that date.

Certainly the State has not demonstrated that, as required by *Swift*, the dangers (at HDM) "once substantial, have been attenuated to a shadow" (indeed they remain as acute today as they did four months ago); or that the State movants are suffering hardship so extreme *and unexpected* as to be regarded as victims of oppression, nor has it made "nothing less than a clear showing of grievous wrong evoked by new *and unforeseen conditions*" (emphasis added).

The State's obligations were not established in the first instance, however, by the judgment of August 20, 1981; but rather by New York Criminal Procedure Law § 430.-20, and neither modifying nor vacating the judgment would operate to absolve the State from its statutory duty. The State's application amounts to a request that this federal court suspend the operation of the State's own statute as to what the working relationship between the State and City Correctional Systems should be. It is ironic that where the federal court's order to a State agency is to obey the statute enacted by its own legislature, the agency asks the federal court to relieve it of that obligation. Such a request should be addressed to the State legislature.[4]

### III.

The preceding discussion establishes that there is no legal justification for granting the State's motion. The subject at hand however involves much more than mere legality. No one who has dealt with the chronic difficulty of prison or jail over-crowding can fail to be sensitive to its human implications, and to the pain which it imposes on inmates, and correctional personnel, alike. Moreover, it is important to remember that the State inmates and correctional personnel are just as human, and suffer just as much when impermissible overcrowding occurs, as do City inmates and personnel. Yet an examination of all the factual aspects of such a difficult case as this nevertheless compels the conclusion that the motion must be denied.

In the bench opinion of July 29, 1981, which supported the judgment of August 20, 1981, six factors beyond the legal obligations of the parties were enumerated as criteria for decision. These were:

"The question of public safety;

The relative impact of the Court's decision on the respective systems;

The relative efforts of the systems themselves to discharge their duties and to solve the problems;

The relative physical space available to the systems, both in terms of beds and in terms of acreage;

The existence of programs or their future availability;

The difference between conditions which exist in detention centers in general and prisons in general."

As to public safety: the same conclusions are to be drawn now as in August, 1981: overcrowding is a serious threat to the security of both State and City institutions. However, State institutions are remote from population centers and its maximum security institutions are walled and protectable. City institutions are massed together in the center of population of New York City and without such physical features as walls.

As to the relative impact of the court's decision on the respective systems: it remains an inescapable fact that the State Correctional system is nearly three times as large as the City's and that the relative impact on the State of additions to its popu-

---

4. Of course no change of State law would be constitutional to the extent that it resulted in impermissible overcrowding in either City or State institutions.

lation of 200–300 people will therefore be proportionately less. Moreover, the impact can be diffused among many more institutions than would be true in the City system.

As to the relative efforts of the systems: while the State has worked hard to add bed space, the City has done the same and has, in addition, introduced population control programs, while the State has not.

As to relative physical space: both systems are overcrowded: the State claiming to be at 112% of capacity and the City at 106%. The difference is marginal and, as explained above, the excess can be handled in the State's larger system with less impact than in the City's smaller. Moreover, the State, as its plans indicate, has plenty of land on which to build additional facilities. The City does not.

At argument counsel for the State contended that the City presently had extra bed space which could house any State-readies which the State would propose ·to leave at HDM until the State's facilities were completed in March, 1982. However, the record does not support the State's contention. The only vacant cells which exist at HDM are those which had to be vacated in order to render conditions at HDM constitutionally permissible. Indeed, earlier in the history of HDM the New York State Commission of Correction, which has responsibility for overseeing all correctional facilities, both State and local throughout New York, ordered the City (in September, 1977) to reduce the HDM population to 1,200, (its present level). In doing so, it observed in a covering letter of that date that:

> "A population in excess of 1200 prisoners at HDM militates against proper sanitation and cleanliness at HDM and poses a threat to the safety, security and well being of persons employed at or incarcerated in HDM."

*Benjamin v. Malcolm, supra,* 495 F.Supp. at 1360–61.

Moreover, if vacated space were to be made available to State-readies, service facilities for food, sanitation, programs, guards, etc. could be strained beyond the limits of the currently fragile balance.

As to the existence of programs or their future availability: it is regrettable that State programs have been curtailed during the period of present overcrowding. Nevertheless, it remains considerably easier to establish and maintain programmatic efforts in a prison setting than in jails.

As to the difference between conditions in detention centers in general and prisons in general: it remains true that a prison population is generally more stable and manageable than the population of a jail.

### IV.

Denial of the State's motion is not to be taken as a failure to appreciate its problems or to understand the difficulties which will be imposed, though fortunately for a temporary period only, upon its inmates and correctional personnel. However, in the last analysis what the State proposes here is to equalize unconstitutionality by requiring the City to share the burden of impermissible overcrowding with the State. The remedy does not lie in equalizing unconstitutionality but in eliminating it.

The State's motion to modify the judgment of August 20, 1981 is denied.

It is so ordered.