John LELSZ, et al. individually and on behalf of all others similarly situated, Plaintiffs,

v.

John J. KAVANAGH, M.D., et al., Defendants.

Civ. A. No. 3–85–2462–H.

United States District Court, N.D. Texas, Dallas Division.

March 4, 1986.

David Ferleger, Philadelphia, Pa., for plaintiffs.

Diane Shisk, Austin, Tex., for Advocacy, Inc., amicus curiae.

Philip Durst & Toni Hunter, Asst. Attys. Gen. of Tex., Austin, Tex., for defendants.

Janice L. Green, Farris & Green, Austin, Tex., for Ass'n for Retarded Citizens/Texas, amicus curiae.

Paul Smith, Washington, D.C., for Parents Assn. for the Retarded of Texas, et al.—intervenors.

## ORDER

SANDERS, District Judge.

This case is before the Court on Defendants' Motion to Modify the Resolution and Settlement, filed October 2, 1985; Response of Intervenor Advocacy, filed October 11, 1985; PART's Memorandum in Support of Defendants' Motion, filed October 15, 1985; Plaintiffs' Response to Defendants' Motion, filed October 17, 1985; Defendants' First Amended Motion to Modify, filed October 25, 1985; Plaintiffs' Response, filed November 1, 1985; Intervenor ARC/Texas' Response, filed November 4, 1985; and Intervenor PART's Reply, filed November 12, 1985.

Defendants seek the following modifications to the Resolution and Settlement:

1. Paragraph 3. Delete all references to Texas state law. The second sentence would state: "These provisions are also intended to secure plaintiffs' other constitutional rights and their rights under federal statutory law."

2. Section 2, Paragraph 8. Insert "strive to" between "will" and "provide" in the first sentence and change "possible" to "available". The sentence would state: "Defendants will strive to provide each member of the plaintiff class with the least restrictive alternative living conditions available consistent with the person's particular circumstances, including age, degree of retardation and handicapping conditions."

3. Add "Nothing in the *Resolution and Settlement* shall interfere with the exercise of Defendants' professional judgment as to the setting of services for the mentally retarded. Thus, the choice as to whether a person of mental retardation can best be served in an institutional or community setting shall be made by Defendants, based on

their professional assessment of the unique needs of the individual and the resources available".

This litigation was commenced on November 27, 1974. Nine years later the parties negotiated a settlement, and on July 19, 1983, the Court approved a consent decree, the Resolution and Settlement ("Settlement"). Now, over a decade after the filing of the suit and over two years after the purported settlement was reached, the Defendants seek to vitiate the responsibilities they expressly agreed to assume by changing the Settlement. The Court finds no justification for the proposed modifications. Consequently, the Defendants' Motion is DENIED.

### I. Power to Modify

■ The first issue to be addressed is whether, and under what circumstances, a court may alter the terms of a consent decree. The principle is settled that consent decrees, like injunctions, are not inviolate once entered into. *See generally* 11 Wright and Miller, *Federal Practice and Procedure* § 2961 (1973). Where a court is supervising a case involving continually changing conditions, the court retains the power to modify its decree "if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *United States v. Swift & Co.*, 286 U.S. 106, 114–15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). Federal Rules of Civil Procedure 60(b)(5) incorporates this standard by authorizing such modification if the court concludes that "it is no longer equitable that the judgment should have prospective application."

■ The exercise of this power lies in the discretion of the court, however. Modification is not a remedy to be lightly awarded; its purpose is to correct injustice, not to permit parties to escape obligations they tire of or find too expensive. "The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting." *Swift*, 286 U.S. at 119, 52 S.Ct. at 464. Parties often find

that responsibilities they earlier agreed to undertake have later become burdensome or disagreeable. The question before the Court, however, is not whether the Defendants, in hindsight, would prefer a different settlement, or no settlement at all, but rather whether circumstances have so changed since the parties reached agreement that continued enforcement of the Settlement in its present form would be inequitable or contrary to law.

The Defendants do not allege any changed facts necessitating modification. They do not contend that providing community placements is burdensome or even that providing such placements is more burdensome now than in 1983. They do not assert that modification of the community placement provision is necessary to facilitate some other goal or provision of the Settlement. *Cf. New York State Association for Retarded Children v. Carey*, 706 F.2d 956 (2d Cir.1983) (modification warranted where Defendants experienced serious unexpected difficulties in finding small community placements and elimination of numerical requirement would facilitate larger goal of closing institution).

Defendants' sole justification for modification is an alleged change in decisional law. Defendants argue that at the time the Settlement was agreed to they believed that Plaintiffs had a constitutional right to community placement or the least restrictive environment, that such belief was mistaken in light of subsequent legal developments, and that this Court, therefore, should modify the Settlement to relieve Defendants of a duty which does not constitutionally exist. The "subsequent legal development" consists primarily of *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and four clarifying cases.[1]

The Circuit Courts of Appeal are split on the issue of whether a subsequent legal decision is sufficient ground for modifying

a final decree. *See United States v. Georgia Power Co.*, 634 F.2d 929, 933 (5th Cir. 1981) (discussing Circuit division on issue of effect of change in decisional law). The Fifth Circuit has approved modification in the event of a *significant change* in decisional law. *Id.* at 934; *Roberts v. St. Regis Paper Co.*, 653 F.2d 166, 173 (5th Cir.1981).

Defendants advance the novel theory that an opinion which was decided *prior* to a settlement constitutes a "significant change" in the law. *Youngberg*, the leading case cited by Defendants on the issue of the constitutional rights of the mentally retarded, was decided in 1982, a year before the Settlement was approved. Defendants were fully cognizant of *Youngberg* when they negotiated the Settlement.

Nor do other cases cited by Defendants support modification. *Association for Retarded Citizens of North Dakota v. Olson*, 561 F.Supp. 473 (D.N.D.1982), was decided a year before the settlement. *Johnson v. Brelje*, 701 F.2d 1201 (7th Cir.1983) was decided five months before the settlement. *Rennie v. Klein*, 720 F.2d 266 (3d Cir. 1983), had been remanded by the Supreme Court in 1982 specifically for reconsideration in light of *Youngberg*. 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381. *Rennie*, moreover, can hardly be taken as a definitive interpretation of *Youngberg*. Five opinions were written, no one of which was able to obtain a majority.

*Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984), is the lone case cited on the issue that is in fact a post-Settlement decision. The Second Circuit determined that the mentally retarded had no constitutional right to community placement. *Id.* at 1247–49. That conclusion, however, rested primarily on the reasoning articulated in *Youngberg*. The court noted that its conclusion was supported by other courts, but

---

1. *Association for Retarded Citizens of North Dakota v. Olson*, 561 F.Supp. 473 (D.N.D.1982), aff'd, 713 F.2d 1384 (8th Cir.1983); *Johnson v. Brelje*, 701 F.2d 1201 (7th Cir.1983); *Rennie v.* *Klein*, 720 F.2d 266 (3d Cir.1983); *Society for Goodwill to Retarded Children v. Cuomo*, 737 F.2d 1239 (2d Cir.1984).

of the six cases cited,[2] four were decided prior to the Settlement.[3]

Defendants, in their First Amended Motion to Modify,[4] cite an additional case as support for modification. In *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court held that federal courts may not enforce state law claims brought into federal court under pendent jurisdiction against state officials. Defendants claim that *Pennhurst* constitutes a significant change in decisional law mandating modification.

*Pennhurst* provides that federal jurisdictional grounds do not override Eleventh Amendment protection. That is, regardless of the federal jurisdictional basis over a particular claim, the Eleventh Amendment protects state officials from claims alleging violations of state law. *Id.* 104 S.Ct. at 919. The Supreme Court has long been protective of the states' Eleventh Amendment immunity and has severely limited any exceptions which threaten to impinge on that immunity. The primary exceptions to the immunity doctrine are found in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), providing that actions challenging the constitutionality of state officials' conduct are not against the state, and *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), providing that violations of federal law may be remedied by injunctions against state officials' future conduct but not by retroactive monetary damages. The Court concluded in *Pennhurst* that neither *Young* nor *Edelman* is applicable in state law suits against state officials. *Pennhurst,* 104 S.Ct. at 911.

This conclusion was hardly novel, however. As the Court itself stated, a contrary approach "is out of touch with reality".

*Id.* In an extensive discussion of prior law, the Court noted that none of its prior Eleventh Amendment or federal sovereign immunity cases authorize injunctive relief against state officials for failing to perform their state law duties. *Id.* at 913. "The plain fact is that the dissent's broad theory ... has not been the law for at least a generation." *Id.* at 916.

■ In discussing the effect of pendent jurisdiction on the Eleventh Amendment, the Court reiterated its view that the Eleventh Amendment may preclude a federal court from hearing claims otherwise within its jurisdiction. *Id.* at 918–19. Pendent jurisdiction, a judge-made doctrine utilized to promote judicial efficiency, does not override the strictures of the Eleventh Amendment. *Id.* at 919. As the Court again noted, the concept of the superiority of the Eleventh Amendment is hardly new. *Id.* at 918–19 (citing *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) and *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam)). "Our decision in *Edelman* ... makes clear that pendent jurisdiction does not permit such an evasion of the immunity guaranteed by the Eleventh Amendment." *Id.* 104 S.Ct. at 919.

Other than the fact that the Supreme Court reversed the Court of Appeals, neither Defendant nor PART provide any justification for their conclusion that *Pennhurst* represents a "radical" change in the law. When faced with a similar attempt to modify a consent decree which was allegedly affected by a subsequent Supreme Court decision, the First Circuit stated:

> We are totally unwilling to ... vacate a consent decree allegedly based on unspecified prior law which has not been directly overruled. If defendant believed

---

**2.** The list includes Defendants' cited cases: *Rennie, Johnson,* and *Association for Retarded Citizens.*

**3.** Of the remaining two, *Rennie,* as previously discussed, was on remand. *Phillips v. Thompson,* 715 F.2d 365 (7th Cir.1983), decided one month after the Settlement, merely affirmed the district court's dismissal of Plaintiffs' due process claims, including claims that plaintiffs were entitled to the least restrictive environment.

**4.** Defendants' three-page motion is hardly a strong argument for modification based on *Pennhurst,* and in fact, seems to be more of an afterthought resulting from the filing of PART's memorandum. The Court has some question as to whether PART has standing to attack the Settlement. *See* Order and Memorandum Opinion of July 19, 1983, at 42 and Order of September 18, 1985, at 7–9. Nonetheless, the Court has considered the issues raised by PART.

that the facts in plaintiffs' complaint were not sufficient to state a cause of action ..., it should not have agreed to a consent decree and should have appealed the decision of the district court if it held against them. Instead it decided to accept a consent decree. There has not been the kind of change in the law since that time to require us to relieve the defendant of the consequences of its decision.

*Coalition of Black Leadership v. Cianci,* 570 F.2d 12, 16 (1st Cir.1978).

Furthermore, the Fifth Circuit has recognized that modifications of consent decrees are not justified in every instance of an intervening law or decision. *Roberts,* 653 F.2d at 174. The Circuit quoted with approval Justice Blackmun's opinion in *Humble Oil and Refinery Co. v. American Oil Co.,* 405 F.2d 803 (8th Cir.1969) (after quoting Justice Cardozo's *Swift* opinion):

> We glean, from this, certain factors of importance: (1) that, where modification and amendment of an existing decree is under consideration, there are "limits of inquiry" for the decree court and for the reviewing court; (2) that the inquiry is "whether the changes are so important that dangers, once substantial, have become attenuated to a shadow"; (3) that the movants must be "suffering hardship so extreme and unexpected" as to be regarded as "victims of oppression"; and (4) that there must be "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions." Placed in other words, this means for us that modification is only cautiously to be granted; *that the dangers which the decree was meant to foreclose must almost have disappeared;* that hardship and oppression, extreme and unexpected, are significant; and that the movants' task is to provide close to an unanswerable case. To repeat: caution, substantial change, unforeseenness, oppressive hardship, and a clear showing are the requirements. 405 F.2d at 813. (Emphasis added).

*Roberts,* 653 F.2d at 174.

Defendants have not established any of these elements. As previously noted, the Defendants have not alleged any hardship or oppression from the Settlement. Indeed, the June 5, 1985 community placement order, which PART cites as an example of the type of order which would be eliminated if modification is granted, only required the placement of 279 mentally retarded persons. At the hearing on the motion, Defendants *voluntarily* agreed to place 900 individuals. June 5, 1985 Order, at 4. Requiring Defendants to place 621 *fewer* persons than they requested can hardly be considered a burdensome order.

Likewise, Defendants have not established that the problems the Settlement was devised to address no longer exist. The Supreme Court has been particularly unwilling to permit modification where compliance is incomplete. *"Swift* teaches that a decree ... may *not* be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree ... have not been fully achieved." *United States v. United Shoe Corp.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968). The record is clear that Defendants have continually delayed or attempted to avoid their obligations under the Settlement. *See* Order of October 1, 1984, at 12–14 ("[Defendants' conduct] betrays at best a haphazard and indifferent attitude toward its obligations and at worst a complete failure to take these obligations seriously."); Order of June 5, 1985, at 22, 24, 26 ("[D]efendants have failed ... adequately to fulfill their responsibilities with regard to community placement of class members...."); Order July 16, 1985, at 1 ("The history of this litigation is one of delay."); Order of August 15, 1985 (failure of Defendants to provide data to Expert Consultant). The Court finds that much remains to be done to implement the Settlement.

■ The law regarding the federal constitutional rights of the mentally retarded and the enforcement of their state rights has not significantly changed since the Settlement was approved. The Defendants could have proceeded to trial, or taken an appeal in the case of an adverse judgment,

and relied on many of the same cases cited for modification. Instead, they chose to avoid the difficulty, uncertainty, and expense of trial by accepting other burdens and obligations. It is too late for Defendants to complain of their choice; they are bound by their bargain.

## II. Effect of *Youngberg* and *Pennhurst*

Even if this Court had determined that *Youngberg* and *Pennhurst* represented significant changes in the law, Defendants would not be entitled to the relief they seek. "When an injunction is modified on the basis of an intervening change in decisional law, that modification must be justified by the new decision." *United States v. Georgia Power Co.*, 634 F.2d 929, 934 (5th Cir.1981). Neither *Youngberg* nor *Pennhurst* require such modification here.

### A. *Youngberg*

*Youngberg* was an action brought on behalf of a mentally retarded individual living in a state institution. The Third Circuit Court of Appeals, reversing a jury verdict for the defendants, determined that the involuntarily committed retained certain fundamental liberties, including interests in freedom of movement, personal security, and rehabilitation. 644 F.2d 147 (3d Cir.1980). The court found these rights to be protected by the Fourteenth Amendment but divided on the issue of the appropriate standard to be used in determining whether the rights had been violated. *Id.* at 159–60, 164, 166–67, 178.

The Supreme Court agreed that involuntarily committed persons retain basic liberty interests in safety and freedom from bodily restraint. *Youngberg*, 457 U.S. at 319, 102 S.Ct. at 2459. The Court, however, reversed in part on the issue of the right to habilitation.

Involuntarily committed mentally retarded individuals have a right to minimally adequate training but only "such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints." *Id.* at 322, 102 S.Ct. at 2461. The Court held that in determining the "reasonableness" of training in a particular case, the lower courts should properly defer to professional judgment. "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462 (footnote omitted).

The requirement of deference to professional judgment has been emphasized in subsequent courts' decisions. *See Rennie*, 720 F.2d at 269 (decision to administer medication presumed valid if based on professional judgment); *Johnson*, 701 F.2d at 1209 ("The Constitution only requires us [to determine that] a *professional judgment* was exercised."); *Association for Retarded Citizens*, 561 F.Supp. at 488 (court bound by Court's mandate to defer to professional judgment); *Phillips*, 715 F.2d at 368 (approving finding that class members receiving adequate training prescribed in exercise of professional judgment); *Society for Good Will*, 737 F.2d at 1247–49 (due process satisfied if restraints imposed on mentally retarded in accordance with professional judgment).

Defendants argue that modification is necessary in order for the Settlement to be in compliance with the Supreme Court's mandate in *Youngberg*. The Court is of the opinion that the Settlement is fully in-step with the dictates of that decision.

Paragraph 8 of the Settlement provides for alternative living arrangements only after an assessment of each individual's needs. There is no authority for random assignments or numerical quotas that are not based on a judgment that the alternative living arrangement is in the individual's best interest. Paragraph 13(a) further clarifies this requirement. A written service plan, directed toward each individual's personal and social growth, development, and appropriate residential environment, must be formulated "in *accordance with professional standards*" for each class

member. (emphasis added). The Settlement further provides that the plan will be developed by an "interdisciplinary team", appropriately constituted in accordance with *professionally acceptable standards.* Settlement, ¶ 13(b) (emphasis added).

The position that the Settlement requires community placement only after the exercise of professional judgment is supported by subsequent court orders in this case:

... not one witness deviated from the position that each recommendation for placement, and all decisions regarding placement, should be made on an individual basis. It was also clearly the intention of the parties at the time of the approval of the Resolution and Settlement that these placement decisions should be made on an individual basis. In addition, it is not only inappropriate but probably unconstitutional for a court to order the placement of all children in institutions into the community. The Supreme Court had made it abundantly clear that it particularly disapproves of judges substituting their own judgment for that of medical professionals in the fields of mental illness and mental retardation. *Parham v. J.R.*, 442 U.S. 584, 608–09 [99 S.Ct. 2493, 2507, 61 L.Ed.2d 101] (1972); *Youngberg v. Romeo*, 457 U.S. 307, 322–23 [102 S.Ct. 2452, 2461–62, 73 L.Ed.2d 28] (1982).

Before any class member can be ordered moved from an institution into the community, there must be some professional evaluation and recommendation that such a step would be in the person's best interests. This is obviously not an analysis the court is competent to make.

At this point, however, it is clearly within the legal power of the court to order that class members already recommended for community placement by professionally constituted interdisciplinary teams be placed in the community.

Order of June 5, 1985 at 19–20 (transcript citations omitted).

█ Nothing in *Youngberg* authorizes state officials to ignore the judgment of their own professionals or precludes a court from enforcing it once the judgment is made. Since the Settlement presently contemplates the exercise and consideration of professional judgment, the modifications sought by Defendants are unnecessary and superfluous.

B. *Pennhurst*

█ *Pennhurst* concerns the enforcement of state-based rights against state officials; it has no application where the claims are based on alleged violations of the Constitution or federal law. The Court must determine whether Plaintiffs' community placement claims are solely based on state-created rights or whether they may be reasonably found to have constitutional underpinnings.

Defendants broadly assert that *Youngberg* and subsequent cases have refuted any claim of a constitutional right to community placement. *Youngberg* dealt with a right to habilitation and did not specifically address community placement or specifically disapprove a "least restrictive environment" analysis. *See Rennie,* 720 F.2d at 275 (Judge Weis concurrence) ("The Supreme Court's [*Youngberg*] opinion did not purport to govern the least intrusive means issue in the case at hand. I would take the Court at its word.") In any case, the Supreme Court did expressly recognize liberty interests in safety and freedom from undue restraint. *Youngberg,* 457 U.S. at 319, 102 S.Ct. at 2459.

█ The Court, moreover, did not limit the right to freedom from undue bodily restraint merely to a right to freedom from being unduly shackled. *See Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1978) (recognizing right to freedom from unnecessary bodily restraints in non-shackle context). An individual confined to an institution against his best interests is unduly restrained to the same extent that an individual shackled to his wheelchair is unduly restrained. If professional judgment dictates that community placement is necessary in the best interest of the individual, then the individual has a constitutional right to such placement, and continued confinement in the institution constitutes un-

due restraint. *See Thomas S. v. Morrow,* 781 F.2d 367, 375 (4th Cir.1986) (approving district court's placement order where community placement based upon professional judgment).

 Even if unnecessary confinement in an institution does not itself constitute a violation of the right to freedom from undue restraint, institutionalization may nonetheless rise to a constitutional violation when it impinges on other liberty interests. "[T]he State is under a duty to provide respondent with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints. It may well be unreasonable not to provide training when training could significantly reduce the need for restraints or the likelihood of violence." *Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462. At the very least, the mentally retarded are entitled to an environment that will safeguard other rights.

 In his concurrence, Justice Blackmun, joined by Justices Brennan and O'Connor, indicated that an individual may have a right to training that will *preserve* those skills that the individual possessed upon entering the institution. *Id.* at 327–29, 102 S.Ct. at 2464–65. Subsequent courts have agreed and expressly adopted Blackmun's more expansive interpretation. *See Society for Good Will,* 737 F.2d at 1250 (individual has due process right to training sufficient to prevent basic skills from deteriorating); *Association for Retarded Citizens,* 561 F.Supp. at 487. The mentally retarded have a constitutional right to an environment which will assist them in preserving basic self-care skills. *See Thomas S. v. Morrow,* 601 F.Supp. 1055 (W.D.N.C.1984), *aff'd,* 781 F.2d 367 (4th Cir.1986); *Clark v. Cohen,* 613 F.Supp. 684, 701–06 (E.D.Pa.1985) (continued institutionalization of mentally retarded individual after professional recommendation of community placement constitutes violation of substantive due process rights).

 In determining whether community placement is proper, the professional judgment must be based on what is *appropriate* not what is *available.* "Lack of funding or of established alternatives is not a factor which may be considered in determining the scope of this constitutional right." *Thomas S.,* 601 F.Supp. at 1059. *Accord, Clark,* 613 F.Supp. at 702, 704, nn. 13, 15. Evidence that the professional judgment was made to conform to what was available may indicate that the judgment was "a substantial departure from accepted professional judgment, practice or standards." Defendants' proposed modifications expressly incorporate an "availability" standard into professional judgment and are therefore unacceptable. The Court doubts, given the history of this case, that community placements will ever be "available" if the modification is permitted.

 Because the Court concludes that the Settlement's community placement provisions are constitutionally based, *Pennhurst* is inapplicable. Defendants' obligations under the Settlement and the June 5, 1985 Order will be enforced.

### Conclusion

The Settlement was not intended to be used solely as a vehicle for improving conditions in state institutions. The provision for community placement is a necessary and integral part of the Settlement and is not to be lightly reconsidered. Defendants' modifications are not mere semantic changes for they strike at the spirit as well as the wording of the Settlement.

The Settlement is consistent with the law on the constitutional rights of the mentally retarded. The requested modifications, on the other hand, effectively eliminate Defendants' obligation to act in accordance with Plaintiffs' rights. The Court will not permit such action.

Accordingly, Defendants' Motion is DENIED.

SO ORDERED.