**David RUIZ, et al., Plaintiffs-Appellees,**

v.

**James A. LYNAUGH, Interim Director, Texas Department of Corrections, et al., Defendants-Appellants.**

No. 86–2772.

United States Court of Appeals, Fifth Circuit.

Feb. 23, 1987.

F. Scott McCown, Melinda Hoyle Bozarth, Asst. Attys. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for defendants-appellants.

William Bennett Turner, Turner & Brorby, San Francisco, Cal., Joel Berger, NAACP Legal Defense & Educational Fund, Inc., New York City, for plaintiffs-appellees.

Before THORNBERRY, DAVIS, and HILL, Circuit Judges.

PER CURIAM:

The Texas Department of Corrections (TDC) appeals the district court's refusal to modify a consent decree that TDC entered into with the plaintiff class of TDC inmates. For the reasons stated below, we affirm.

## I.

After many years of litigation over the overcrowded conditions of TDC, TDC and representatives of the plaintiff class filed the Stipulation Modifying Crowding Provisions of the Amended Decree (Crowding Stipulation). In the Crowding Stipulation, TDC agreed to abide by the capacity limits, housing standards, and confinement requirements as defined in the agreement while the plaintiffs agreed to forego the much more stringent limits on TDC population and changes in conditions that they had earlier requested. On July 15, 1985, the district court approved the Crowding Stipulation, finding it "to be a fair, adequate and reasonable settlement of all issues."

Because the Crowding Stipulation defines the parties' obligations involved in this appeal, we briefly summarize the agreement's most pertinent provisions.[1] The Stipulation is a comprehensive management scheme that seeks to reduce the crowded conditions in all Texas penitentiaries. This goal is to be achieved by a process of renovating existing prisons, building new facilities, and limiting overall system capacity. As the cornerstone of this plan, TDC and the state of Texas agreed to limit the state-wide prison population to 95% of TDC's maximum capacity. *Crowding Stipulation* § II H, at 6.

In specifying how this 95% population cap was to be observed, the Crowding Stipulation distinguishes between existing and new housing. TDC agreed to limit the population at each existing prison unit to a specified percentage by a particular date. *Id.* § G, at 5–6. The Stipulation also provides that TDC can only use certain facilities in calculating the maximum capacity of its presently existing system. Only then-existing facilities[2] which met or would meet after renovation the Stipulation's standards could be counted in figuring TDC's capacity. *Id.* § II, at 2–9. The Stipulation works basically on the principle that overcrowding in then-existing units would be reduced through the building of new facilities which comply with the agreement's standards.

While providing for new housing additions to the Texas prison system, the Crowding Stipulation limits the type of facilities which can serve as new housing. *Id.* § III, at 9–16. Any new housing must be either non-dormitory prisons, trusty camps, or approved additions to existing units. New prison facilities cannot contain dormitories. *Id.* § III, A, at 9. The use of temporary housing to relieve overcrowding is strictly prohibited. *Id.* § IV D, at 21–22. Prisoners may be housed in temporary facilities only if they are part of a roving work crew or displaced by renovation of existing regular housing. *Id.* § IV D(3), at 22.

Both new and existing facilities must meet the spacing and condition requirements set out in the Crowding Stipulation. Minimum living space area for each inmate is established; the amount of space required is dependent on where the inmate is housed. *See Id.* §§ III B(3), C(1), IV A(1),

1. All references to the Crowding Stipulation will include, where applicable, section, subsection, and page as assigned by the Stipulation's drafters.

2. The Stipulation lists the following facilities as existing units of the TDC: Beto I, Beto II, Central, Clemens, Coffield, Darrington, Diagnostic, Eastham, Ellis I, Ellis II, Ferguson, Gatesville, Goree, Hilltop, Huntsville, Jester I, Jester II, Jester III, Mountain View, Pack I, Pack II, Ramsey I, Ramsey II, Ramsey III, Retrieve, Wynne.

at 10, 12, 13–14. The Stipulation provides that each facility must have a recreational area, educational and work opportunities, and medical facilities. Adequate toilet, lavatory, and shower facilities, as defined in the Stipulation, must also be provided. Finally, TDC is obligated to provide adequate visitation time, sufficient clothing, linens and towels, and staffing at each facility, again as defined in the agreement. *Id.* §§ VI, VII, IX, at 25–28, 30–33.

As the above synopsis indicates, the Crowding Stipulation embodies an ambitious policy to eliminate the overcrowded conditions at TDC. In implementing this policy and agreeing to the capacity and housing restrictions contained in the Stipulation, the parties acknowledged the role certain factors could play in the implementation of the agreement. The parties stated:

> In entering into this Stipulation, the parties acknowledge that the safety and security of prisoners and staff is a matter of mutual concern. The parties further acknowledge that certain conditions and eventualities are within the contemplation of the parties. These include the possibility that TDC may experience a substantial increase or decrease in its population; that the rate of crime and/or conviction within the state of Texas may continue at its current rate or increase or decrease substantially; that the incidence of parole may increase or decrease substantially; that the cost of construction of new facilities and/or renovation of existing facilities may increase or decrease substantially; that substantial difficulty may or may not be encountered by TDC in attracting and employing security and non-security staff; and that substantial construction delays may or may not occur with respect to the renovation of existing units or the construction of new facilities, units or additions thereto.

*Id.* § X A, at 33. When approving the Crowding Stipulation, the district court emphasized that "none of these eventualities, should they occur, will affect the scope of defendants' obligations under the Crowding Stipulation." We note the Stipulation does provide, however, that either party reserves the opportunity by appropriate motion to modify the provisions of the agreement. *Id.* § X B, at 34.

As of July 1985 the court-adopted Crowding Stipulation made it appear that the long dispute over prison population and housing conditions at TDC was to be resolved. As one counsel remarked: "We indeed are entering a new day in the Department of Corrections...." The optimistic view that "[t]his Stipulation resolves all issues with regard to those provisions and obviates the need for further hearing on crowding issues contemplated by the Fifth Circuit Court of Appeals," [3] however, was premature and short-lived.

The source from which this appeal springs is TDC's request for relief from the Crowding Stipulation. On September 12, 1986, TDC moved the district court for temporary relief pursuant to Fed.R.Civ.P. 60(b), seeking a modification of the Crowding Stipulation so that it could increase capacity of the prison system without new construction. TDC asserted that an unforeseen and extraordinary 12.02% increase in 1985–86 inmate admissions to the prison system justified the modification. The plaintiffs objected to the motion, and the district court issued a temporary restraining order prohibiting TDC from taking any action to expand its capacity before a formal hearing could occur on September 15.

At the formal hearing TDC requested the following modification of the Crowding Stipulation:

(1) that TDC be allowed to use 95 beds at the TDC Hospital at Galveston for 180 days;

(2) that TDC be allowed to exceed the population cap the Crowding Stipulation set for the Wynne unit by 305 beds for 180 days; and

(3) that TDC be allowed to use 300 beds at the Fort Wolters National Guard

---

3. *Crowding Stipulation,* § I (Scope and Effect of Stipulation), at 1.

Armory at Mineral Wells, Texas, for 180 days.

TDC had in fact added these 700 beds to its capacity figures on September 11 so as to avoid surpassing the Stipulation's 95% population cap.[4] The plaintiffs opposed the use and counting of all seven hundred beds and requested a permanent injunction against their use and consideration by TDC.

The district court heard both motions together by consent of the parties. At the conclusion of the hearing on September 16, the district court extended the temporary restraining order for ten days. On September 19 the district court denied TDC's motion to modify and issued a permanent injunction prohibiting TDC from using any of the facilities for housing inmates and from incorporating the 700 beds in TDC's capacity figures after October 1, 1986.[5] In denying TDC's motion to modify, the district court found that the use of the proposed facilities violated the Crowding Stipulation because they were substandard and/or not facilities authorized for use under the Stipulation; that TDC had entered into the Stipulation knowing that increases in admissions and population could occur; that increases in admissions and population had occurred, but that these increases were not unforeseen nor extraordinary so as to justify relief in favor of TDC.

TDC filed a timely notice of appeal challenging the denial of its motion to modify and the granting of plaintiffs' motion for permanent injunction.[6]

## II.

The issue presented in this appeal is whether the district court abused its discretion in denying TDC's request for modification of the Crowding Stipulation. As we explain below, we do not believe the district court abused its discretion.

4. TDC's September 11 action was also taken so as to avoid the operation of the Texas Prison Management Act, Tex.Rev.Civ.Stat.Ann. art. 6184o (Vernon Supp.1986), *amended by,* Act of Sept. 30, 1986, ch. 8, § 2, 1986 Tex.Sess.Law Serv. 19 (Vernon).

In 1983 the 68th Texas Legislature adopted the Act to deal with emergency prison overcrowding. The Act provides that if TDC surpasses the 95% population cap the Director notifies the Governor of this fact and credits 30 days of administrative good time to any inmate who is classified by TDC as a trusty or Class 1 inmate and who is not serving a sentence for capital murder, aggravated kidnapping, aggravated rape, aggravated sexual abuse, aggravated robbery, or an offense involving the use or display of a deadly weapon. *Id.* art. 6184o, § 2. A single credit of 30 days of administrative good time generally translates into a prisoner being released 12 actual days before he or she otherwise would have been released. The Act has been recently amended to require that TDC's population exceed and remain above the 95% cap for five consecutive days or reaches 95% of capacity for 20 days within a 30-day period before any credit of good time occurs. Act of Sept. 30, 1986, ch. 8, § 2, 1986 Tex.Sess.Law Serv. 19 (Vernon).

Within thirty days of the overcrowding notification, the Governor certifies that an emergency overcrowding situation exists and informs the Board of Pardons and Parole. At that time the Board advances by thirty days the parole eligibility and review date of the appropriate inmates. If after sixty days the overcrowding situation has not dissipated, the Board advances the parole eligibility and review dates by an additional thirty days. At the 120-day point, with a continued emergency situation, a second award of thirty days of administrative good time is granted. Finally, if the emergency persists, the Governor may at his discretion authorize a third advance of the parole eligibility and review dates. Tex.Rev.Civ.Stat.Ann. art. 6184o, § 2(c-g) (Vernon Supp.1986).

As we noted in our Denial of Stay Pending Appeal, TDC's population has hovered around 94% of capacity during 1986. *See infra* note 17.

5. Neither the district court nor plaintiffs interpret the court's September 19 order as retroactive. Plaintiffs also do not assert in this appeal that this order should be applied retroactively to September 11 so that the Texas Prison Management Act would be activated. For these reasons, we do not consider the September 19 order to be retroactive nor do we consider the effect of the activation of the Prison Management Act.

6. On September 22, TDC sought an Order Suspending Injunction Pending Appeal pursuant to Fed.R.Civ.P. 62(c), from the district court. The district court denied TDC's request. TDC next moved for a stay of the injunction pending appeal from this court, pursuant to Fed.R. App.P. 8(a). On September 30, we denied TDC's motion finding that TDC had failed to establish the irreparable harm necessary to warrant such a stay. *Ruiz v. McCotter,* No. 86-2772 (5th Cir. Sept. 30, 1986) (not published).

■ It is well-settled that consent decrees once entered are not inviolate. *See Systems Federation No. 91 v. Wright,* 364 U.S. 642, 650, 81 S.Ct. 368, 372, 5 L.Ed.2d 349 (1961); *Roberts v. St. Regis Paper Co.,* 653 F.2d 166, 172 (5th Cir.1981). *See generally* 11 Wright & Miller, *Federal Practice and Procedure* § 2961, at 598 (1973). Where a court is supervising a case involving continually changing conditions, the court retains the power to modify a consent decree. *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); *Duran v. Elrod,* 760 F.2d 756, 758 (7th Cir.1985). Most requests for modification are made by way of Fed.R.Civ.P. 60(b).[7] *E.g., United States v. Georgia Power Co.,* 634 F.2d 929, 931–32 (5th Cir. 1981); *Mayberry v. Maroney,* 558 F.2d 1159, 9963 (3d Cir.1977). The decision to modify or not to modify a consent decree lies within the discretion of the district court. *Neely v. City of Grenada,* 799 F.2d 203, 207 (5th Cir.1986); *Lelsz v. Kavanagh,* 629 F.Supp. 1487, 1489 (N.D.Tex.1986).

■ Modification of a consent decree however is not a remedy to be lightly awarded. The district court's discretionary ruling is not unfettered; it is guided by certain legal principles. It has been stated that "modification under rule 60(b) requires 'that a significant change of circumstances shall have occurred since the date of the final judgment to warrant its modification.' " *Duran v. Elrod,* 713 F.2d 292, 296 (7th Cir.1983) (citing *Benjamin v. Malcolm,* 528 F.Supp. 925, 928 (S.D.N.Y.1981)). In the leading Supreme Court case on modification of consent decrees, Justice Cardozo stated:

A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need....

\* \* \* \* \* \*

There is need to keep in mind steadily the limits of our inquiry to the case before us. We are not framing a decree.

We are asking ourselves whether anything has happened that will justify us now in changing a decree. The [consent decree], whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting.... The inquiry for us is whether the changes are so important that the dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the [consent decree] is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

*United States v. Swift & Co.,* 286 U.S. 106, 114, 119, 52 S.Ct. 460, 462, 464, 76 L.Ed. 999 (1932). Subsequently, the Supreme Court has stated that "*Swift* teaches that a decree may be changed upon an appropriate showing, and it holds that it may not be changed in the interest of the defendants if the purposes of the litigation as incorporated in the decree have not been fully achieved." *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968).

We have adhered strictly to the teachings of *Swift* in cases involving consent decrees between private parties. *See Roberts v. St. Regis Paper Co.,* 653 F.2d 166, 173 (5th Cir.1981); *cf. Neely v. City of Grenada,* 799 F.2d 203, 211 (5th Cir.1986) (court should modify consent decree in favor of defendant only if purpose of dispute has been fulfilled).

In *Roberts* we stated:

[T]his means for us that modification is only cautiously to be granted; that the dangers which the decree was meant to foreclose must almost have disappeared;

---

**7.** The three traditional grounds for seeking modification of a consent decree are: (1) change in the operative facts; (2) change in the relevant substantive law; and (3) change in statutory law. 11 Wright & Miller, *Federal Practice & Procedure* § 2961, at 604–05 (1973).

that hardship and oppression, extreme and unexpected, are significant; and that the movant's task is to provide close to an unanswerable case. To repeat: caution, substantial change, unforeseenness, oppressive hardship, and a clear showing are the requirements.

*Roberts,* 653 F.2d at 174 (quoting *Humble Oil & Refining Co. v. American Oil Co.,* 405 F.2d 803, 813 (8th Cir.1969) (Blackmun, J.)). *See also Mayberry v. Maroney,* 558 F.2d 1159 (3d Cir.1977); *Duran v. Elrod,* 713 F.2d 292 (7th Cir.1983); *Benjamin v. Malcolm,* 528 F.Supp. 925 (S.D.N.Y.1981); *McGoff v. Rapone,* 78 F.R.D. 8 (E.D.Pa. 1978). *See generally* Jost, *From Swift to Stotts and Beyond: Modification of Injunctions in the Federal Courts,* 64 Texas L.Rev. 1101 (1986).

Within the past few years, however, a less demanding standard for modification of consent decrees has emerged within the institutional reform arena. While adhering to the *Swift* principles that a modification should not vitiate the decree and that the defendant bears the burden of establishing the reasons supporting an alteration, several courts and commentators have asserted that the unique nature and demands of institutional reform litigation necessitate a more flexible approach to modification.[8] *See New York State Association for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 970 (2d Cir.1983); *United States v. City of Chicago,* 663 F.2d 1354, 1359–60 (7th Cir.1981); *Newman v. Graddick,* 740 F.2d 1513, 1520–21 (11th Cir.1984); *Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114, 1120–21 (3d Cir. 1979); *Nelson v. Collins,* 659 F.2d 420, 424 (4th Cir.1981); *Benjamin v. Malcolm,* 564 F.Supp. 668, 686 (S.D.N.Y.1983). We find it unnecessary on the facts of this case to choose between the two standards.

We must affirm the district court's refusal to modify the Crowding Stipulation unless it abused its discretion. *Neely v. City of Grenada,* 799 F.2d 203, 211 (5th Cir.1986). We note that a district court's decision to modify a consent decree in an ongoing institutional reform case is committed to that court's discretion because it is intimately involved in the often complex process of institutional reformation. It has the personal knowledge, experience, and insight necessary to evaluate the parties' intentions, performances, and capabilities. We decide whether the district court's decision and the decision-making process were merely reasonable.

The district court premises its refusal to modify the Crowding Stipulation on the following findings:

(1) the facilities that TDC wishes to use do not meet the Crowding Stipulation's standards;

(2) TDC had agreed to use only certain facilities to house prisoners and compute capacity and the requested facilities were not within the Stipulation's provisions;

(3) at the time TDC entered the Stipulation it acknowledged and accepted that an increase in admissions and population could occur;

(4) at the time TDC entered into the Stipulation it had projected a higher rate of admissions and population increase than was extant in August and September 1986;

(5) that the Prison Management Act reflected Texas' policy of using administrative procedures to avoid overcrowding in Texas prisons;

(6) that TDC had failed to establish a probability of harm to the public if relief was denied; and

---

**8.** The flexible approach has been said to allow modification "with a freer hand." *Carey,* 706 F.2d at 970. This approach allows modification even if the defendant cannot establish the unforeseen change in circumstances required by the *Swift* standard. If the defendant (1) can establish some change in circumstances has occurred from the time the decree was negotiated and approved; (2) convince the court that it has attempted to comply with the decree in good faith; and (3) asks for a modification that does not frustrate the original and overall purpose(s) of the decree, then the court may grant modification. *See Carey,* 706 F.2d at 969–70; *Philadelphia Welfare,* 602 F.2d at 1120–21; *Benjamin,* 564 F.Supp. at 686.

(7) that if relief was granted the overall conditions in TDC would fall below the Crowding Stipulation's standards.

We must accept these findings of fact as correct unless they are clearly erroneous. *Anderson v. City of Bessemer,* 470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); Fed.R.Civ.P. 52(a).

■ Our independent review of the record indicates that the district court's findings are supported by the evidence and certainly not clearly erroneous. Of particular note, the record establishes that three months prior to TDC's entry into the Crowding Stipulation, its consultants projected that TDC's population would be over 39,000 by 1986. TDC population is now at approximately 38,000. Furthermore, the 12.02% increase in admissions cited by TDC as sufficient cause to justify modification is consistent with TDC's admission rates prior to and since the Stipulation was formulated and formalized. TDC Director O.L. McCotter recognized that TDC has experienced in the past admission increases of 21 to 14%. Finally, the record reflects that TDC will not be able to construct new housing meeting the Stipula-

tion's guidelines and requirements even within the 180–day "temporary relief" period it requests.

TDC's request for modification certainly fails under the stricter standards of *Swift.* TDC did not establish the requisite unforeseen factual change necessary for modification under *Swift.* At the time it entered into the Crowding Stipulation TDC foresaw increased admissions and population; those events have occurred. It is clear that TDC cannot now successfully contend that those changes merit relief. *See Duran,* 713 F.2d at 296; *Mayberry,* 558 F.2d at 1159; *Benjamin,* 528 F.Supp. at 929.[9]

Moreover, even under the flexible approach to modification, the district court did not abuse its discretion. The modification sought by TDC would abrogate the primary objective of the decree, i.e., to reduce overcrowding in TDC through use of facilities meeting agreed-upon standards. If modification were granted, TDC would be allowed (1) to house prisoners at facilities which are admittedly below the Crowding Stipulation's requirements and which are not provided for in the agreement;[10]

---

**9.** TDC relies heavily on section X B of the Crowding Stipulation in its argument that it deserves relief despite the provisions of section X A that state TDC foresaw the possibility of increased admissions and population. Section X B of the Stipulation merely recognizes the right both parties have under the law—the opportunity to seek modification. It does nothing more than this. It certainly does not operate, as TDC suggests, as an eraser of section X A's provisions. As we stated *supra* the assertion of a party's opportunity to seek modification does not suspend the Crowding Stipulation's provisions so that a new agreement may be erected in its place.

**10.** The district court found that the conditions at each of the disputed facilities were below the Crowding Stipulation's minimum guidelines and requirements. Our review of the record confirms these findings.

The Fort Wolters facility lacks adequate security devices for even the confinement of low-risk inmates. The facility also could not provide inmates with the necessary medical and food services. The barracks are below TDC's own safety code standards for fire prevention and security maintenance. Fort Wolters also does not meet the Stipulation's minimal requirements for toilet, lavatory, and showering facili-

ties. It also appears that the water supply to the facility is often not potable and usually the water pressure is low. Finally, the facility does not provide the agreed upon recreational, training, and visitation opportunities for inmates. We agree with the district court that "[i]n sum, the Fort Wolters proposal is sorely deficient."

As for the Galveston Hospital facility, it too lacks adequate toilet, lavatory, and showering facilities. As an example, only three toilets and eleven shower heads would be available for approximately one hundred inmates. Only limited recreational and dayroom space would be available. Training and educational programs would be mostly unavailable. While medical services would be available, the additional burden on the existing food services would be substantial. And as with the Fort Wolters facility, the transfer of additional security personnel to adequately police the facility would tax an already overtaxed TDC system.

The Wynne Unit is already overpopulated and apparently not in compliance with the Stipulation's provisions even without the requested increase in inmate beds. While renovations continue to bring the facility into line with the Stipulation, it lacks the food, medical, training, and recreational services to accommodate an increase in inmate population. The facility

(2) to transfer resources and administrative personnel from other TDC units thus lowering many of those units below the Stipulation's requirements; and (3) to again avoid its assurance that new facilities meeting the Stipulation's requirements will be constructed to relieve overcrowding. TDC does not seek the type of modification that the flexible approach seeks to promote, *see, Carey,* 706 F.2d at 969–70 (alteration of duties under decree while maintaining decree's overall purpose), rather TDC now seeks to set aside the Crowding Stipulation's original obligations. *See Benjamin,* 564 F.Supp. at 686.

### III.

We therefore affirm the district court's refusal to modify the Crowding Stipulation.

AFFIRMED.

ROBERT MADDEN HILL, Circuit Judge, specially concurring:

I agree with the result reached by the court in this case, but I write separately because I believe we should explicitly endorse the flexible approach for modification of institutional reform consent decrees as a guide for district courts involved in on-going and future public law litigation.

As the court mentions, a more flexible standard for modification of consent decrees in institutional reform litigation has been recognized recently. *See supra* at 859.[1] The courts and commentators that have supported this flexible approach to modification have noted that institutional reform litigation presents unique problems for both a federal court and the parties; these same difficulties are often not present in standard private litigation (the area in which the *Swift* rule developed). For the federal court which is involved in institutional reform litigation, it must balance its duty to protect federal constitutional and statutory rights with the delicate problems of federalism and separation of powers which are always implicated when a federal court directs state authorities to take certain actions in administering a state-run institution. *See Ruiz v. Estelle,* 679 F.2d 1115, 1148–50 (5th Cir.), *amended in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). For the parties involved in institutional reform litigation, they are often charged with the duty of representing and/or confronting interests that are not directly before the court. *E.g., Duran v. Elrod,* 760 F.2d 756, 759 (7th Cir.1985). Finally, both the court and the parties must grapple with the fact that consent decrees in institutional reform cases are not so much peremptory commands to be obeyed in absolute terms, as they are future-oriented plans designed to achieve broad public policy objectives during the course of complex and ever-changing factual situations. *Carey,* 706 F.2d at 969–70. The need to accommodate the variety of interests and concerns present in institutional reform litigation, to recognize the future-oriented nature of decrees arising out of reform litigation, and to appreciate the factual complexity of this form of litigation suggests that greater judicial flexibility is warranted when a court overseeing such a case is confronted with a request to modify the governing decree.

A flexible standard for modification of a consent decree is well-suited to the institu-

could also not supply basic laundry and clothing needs of additional inmates. The Wynne Unit could also not provide the minimum level of toilet, lavatory, and showering facilities to the additional inmates. In summary, the Wynne Unit is already overcrowded and understaffed and an addition to the population cap would only worsen the situation.

1. *See also* Chayes, *The Role of Judges in Public Law Litigation,* 89 Harv.L.Rev. 1281, 1284, 1292 (1976); Chayes, *The Supreme Court—1981 Term —Forward: Public Law Litigation and the Burger Court,* 96 Harv.L.Rev. 4, 55 (1982); Diver, *The Judge as a Political Pawnbroker: Superintending Structural Change in Public Institutions,* 65 Va.L.Rev. 43, 63 (1979); Fiss, *The Supreme Court—1978 Term—Forward: The Forms of Justice,* 93 Harv.L.Rev. 1, 49 (1979); Fletcher, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy,* 91 Yale L.J. 635, 638–41 (1982); Rudenstine, *Institutional Injunctions,* 4 Cardozo L.Rev. 611, 613 (1984); Special Project, *The Remedial Process in Institutional Reform Litigation,* 78 Colum.L.Rev. 780, 818 (1978).

tional reform arena. The standard set out (but not adopted) in the court's opinion, *see supra* at n. 8, accommodates the variety of interests, both individual and public, and the changing factual situations that arise in federally-mandated state institutional reform. It also allows a federal court to balance the practical federalism problems presented when exerting control over a state penal institution such as in this case.

I therefore believe that it would be in the best interest of all concerned for this court to adopt the flexible modification standard in this case in the testing of the state's request for modification of the Crowding Stipulation. To fail to do so leaves the question undecided as to what standard should be applied when a federal court is asked to modify an institutional reform consent decree. There can be no doubt that institutional reform litigation is indeed unique and has an impact far beyond the scope of those parties directly involved. This difficult type of litigation will also play a continuing role in the federal judicial system. In light of this, I think we are charged with the responsibility to be as definite as possible on the rules which govern the handling of such litigation. Therefore I write separately because of my conclusion that we have not fully carried out this important responsibility.